## W. L. DYKES v. STATE.

### No. A-1695.   Opinion Filed July 3, 1915.

1.   **EVIDENCE — Malice — Res Gestae — Other Offenses.**   Testimony which tends to establish intent or malice upon the part of a defendant, or which tends to identify him as the person who committed the crime for which he is on trial or which is a part of the res gestae, is admissible in evidence when of substantive value, even though such testimony may disclose the commission of other separate and distinct offenses.

2.   **SAME—Confession of Other Party.**   A defendant who is being tried on a criminal charge is not entitled to introduce proof which has for its purpose the establishing before the jury the fact that some other person has confessed that he committed the crime, and that the defendant had nothing to do therewith and was not concerned therein.   For a discussion of this principle, see quotation in the opinion from **Donnelly v. United States,** 228 U. S. 243.

(Syllabus by the Court.)

*Appeal from District Court, Johnston County;*
*Robt. M. Rainey, Judge.*

W. L. Dykes was convicted of manslaughter, and appeals. Affirmed.

*Newman & Lawrence* and *Ratcliff, Cruce & Potter,* for plaintiff in error.

*Smith C. Matson,* Asst. Atty. Gen., and *Jos. L. Hull,* Special Asst. Atty. Gen., for the State.

ARMSTRONG, J.   The plaintiff in error, W. L. Dykes, was placed on trial at the October, 1911, term of the district

court of Johnston county on a charge of murder, and was convicted of manslaughter in the first degree. The punishment was fixed at fifteen years in the state penitentiary.

The homicide, which is the basis for the judgment of conviction in this case, occurred on the 25th day of May, 1911, in a remote and out of the way district, and near a place called Devil's Den, in Johnston county, Oklahoma. The material facts, as given in evidence by the various witnesses called, are practically as follows:

J. M. Williams, sheriff of Johnston county, testified that he found the body of Campbell Henderson on the night of May 25th, in a small area of timber on Pennington creek, near Devil's Den, in Johnston county, Oklahoma.

Josylin Hart testified that he is a student at the A. & M. College in Tishomingo; fifteen years of age; went home with Campbell Henderson on May 25, 1911; was accompanied by Monroe Wolfe, the son-in-law of Henderson; that the latter's home was two miles west of Tishomingo; that they then went out near the house, searching for mulberries, and met defendant, Dykes. Dykes called to Henderson to stop—wanted to show him something; gave Henderson whisky, then went to the house with them, and ate dinner there. Dykes had something to say to deceased about a gold mine, and told him if he wanted to go with him, to get ready. He said he did not want the mine dug. Dykes had three or four bottles of whisky in his buggy. After dinner, Henderson and Dykes left in Henderson's buggy, and Wolfe rode horseback. Henderson had no pistol, but had a twenty-two target rifle. He (witness) did not see any pistol on Wolfe.

Wiley Melton testified that he is city marshall of Tishomingo; was in Ravia on the morning of May 25th; saw defendant Dykes there about ten o'clock. Dykes said he came there to meet someone and he had not met him, and the next time he would know it. He called the name, but witness did not recall it. Ravia was about three miles from where Henderson lived.

Celia Henderson, wife of deceased, testified that Campbell Henderson and one Hart were out hunting squirrels on May 25, 1911, and came home for dinner, Dykes accompanying them. Deceased and Dykes were drinking from a bottle Dykes took out of his saddle pockets. After dinner Dykes and Henderson went to the pasture, where the land was, in Henderson's buggy. Monroe Wolfe went along on horseback. Deceased had a twenty-two target, but had no pistol. Wolfe had no gun nor pistol.

Ena McClain testified that she was at Henderson's home on May 25th, and overheard a conversation between him and defendant Dykes relative to leasing a gold mine.

I. Kirkland testified that he lived at Devil's Den, and was there on May 25th, 1911. About dark he heard two shots fired north of the Den. He was about four hundred yards from where the shots were fired.

Dave Underwood testified that on the 25th of May, 1911, he was in Tishomingo; that he. then went out to Devil's Den about three o'clock with a Mr. Reed of New York and a Mr. Williams. He saw two men pass in a buggy, and another riding horseback. Campbell Henderson was the only one he knew, but learned that the other two were defendant Dykes and Monroe Wolfe. They drove about 150 yards past the Den when Campbell Henderson called to him. Witness conversed with Dykes there, and the latter wanted to know if he was still interested in the hunting and fishing business up there. Then he asked if witness had heard about the trouble with the boys having a mining camp up there. Dykes said any of his friends could fish and hunt there whenever they wanted to, but he didn't want any prospecting up there. Dykes had some whisky in a bottle labeled "Yellowstone." They were all drinking to excess.

Rufus Brock testified that he lived about a mile and a half from Devil's Den. Standifer lived on a place about 300 yards from him, owned by Campbell Henderson, but under the control of Dykes. Standifer and Jim Crawford were working for Dykes in May, 1911. Witness saw Standifer at his home about one o'clock on May 25th, 1911, and about three or four

o'clock saw Standifer and Jim Crawford at Slippery Falls, a place about a mile and a half or two miles north of Devil's Den. That night at about seven or eight o'clock, he saw them there again. They were traveling horseback at the time, and were drinking; were going toward Standifer's home.

Tom Eccles testified that he was camping at Slippery Falls with his wife, a Miss Cox, a boy named Hall, and two brothers. On May 22, 1911, Jim Crawford and Dykes came there; Crawford wanted witness to take a drink, and when he refused, shot at the ground to scare him, and one of the shots hit him after glancing upwards. Dykes came up and made him quit. Dykes said to go ahead and fish, that there would be no more trouble for them, but if they stayed there, they would be liable to see some trouble. He said he was expecting some trouble with the mining people.

This testimony was corroborated by Maggie Cox and Mrs. Eccles.

Sam McDonald testified that the Campbell Henderson land was about a half mile north of Devil's Den. He and his associates had a mineral lease on the land. About the last of March they began prospecting on the land. About the first of May, Dykes stopped witness and told him he was going out to the land that morning and tear down their tent. Later that day, witness met Dykes on the land. The tent had been torn down. Dykes stated that he had done it. After some conversation, Dykes rode off, and when he returned shortly, witness was loading up some tools and other things, and when he was almost through loading, Dykes gave a "war whoop," and Standifer and Jim Crawford appeared in the scene. He and Jim Crawford then took the things that were not loaded on to their wagon down to the creek and left them there. Dykes then warned witness that he did not want them on the land any more. Standifer and Jim Crawford were standing behind a rock when Dykes called to them.

The cross-examination of this witness indicated that he and associates were financing a special prosecution of Dykes. This witness was corroborated in his testimony by H. B. Bland.

George Van Noy testified that at about eight o'clock on the evening of the homicide he was asleep at his home, when Dykes, the defendant, went there and awakened him. Dykes told him he wanted him to go up the creek with him; that he had killed two fellows up there—Campbell Henderson and another Indian. Witness asked him how it happened, but defendant seemed to be in a hurry, and told witness he could go and see for himself. Witness went there, but on the way stopped at Bob Standifer's. Jim Crawford, who was there, showed witness the way to the place where the bodies were.

A. H. Nesbitt testified that he had a conversation with defendant in Tishomingo about eight or nine o'clock on the evening of the homicide, in which he stated that he had to kill them. Jim Howard heard this conversation and corroborated witness Nesbitt. Frank Hall had a similar conversation with defendant.

H. B. Warfield, postmaster, testified that Dykes told him there were two dead Indians out in his pasture; asked him to go out; was present when Dykes told Williams he would give up to him; went out, and helped bring in the bodies.

Sheriff J. M. Williams, recalled, testified that Dykes surrendered to him; that he asked Dykes if he killed these men, and he replied: "I am not talking." He went out to the place of the homicide. Both bodies were powder burned near the wounds. Dykes was out there, and asked the sheriff what he found. He told him he had to hold an inquest over the bodies before he could move them. Dykes told him to go ahead and move them, that he had killed them. The witness then told defendant he found in his gun two empty shells and three loaded ones, and he asked the size of them. Witness told him one was a forty-five Colts, and one a thirty-eight Winchester. That Dykes ran his hand into his pocket, pulled out a half dozen shells and said: "You see I use both kinds in my gun, and loaded that pistol with some of each kind—these are the kind that did the work to the Indians." Witness searched three times for another gun at the place of the homicide but never found one. The fol-

lowing Sunday witness found a pistol there, about twenty-five steps from where Monroe Wolfe's body was found.

W. L. Dykes, the defendant, testified that he holds leases on allotments to Campbell Henderson, Celia Henderson, Nora Wolfe, and Francis Wolfe. He was using the land for pasture for cattle. On the morning of the homicide he was in Tishomingo; left town about eight o'clock and went to Ravia, where he had an appointment with Mr. Gregg. He got there about ten o'clock, talked a little with Gregg, and left about eleven o'clock. He took three pints of Yellowstone whisky with him. When he passed Campbell Henderson's, he met them, and asked them to go up to the pasture to. fix a fence that was down. They said they would go with him if he would stop and eat dinner with them. They started after dinner for the pasture, and stopped near Devil's Den to rest. Monroe Wolfe wanted to know if defendant would not give him more for some land he had sold him, and defendant said he would give sixty-five dollars more, but that he had paid enough already. Wolfe then became mad—he was getting drunk—and began to cry and curse defendant, who replied that he could throw him into the creek if he wanted to. Just about that time Jim Crawford and Bob Standifer rode up. Jim threw his gun on Campbell and told him to give him some whisky. Monroe Wolfe went over towards the buggy, and started back toward Campbell, with his target in his hand; Campbell then said something to him in Choctaw and when he did, Jim Crawford shot him, and then turned his gun right across his horse's neck, and shot Wolfe. He then told defendant to go to town and say that he did it, in order that he might escape, and defendant was drunk and did it. Never arranged with Jim Crawford or anyone to kill the Indians.

In rebuttal, some impeaching testimony was introduced by the state for the purpose of affecting the credibility of witnesses for the defendant.

On behalf of the plaintiff in error, witness W. R. Standifer, who was jointly charged, testified that he was in Tishomingo the morning of the homicide, and went home after dinner; had

dinner at Jim Crawford's; got home about one o'clock; looked for Dykes in town that day, but could not find him; saw Jim Crawford; left him in his lot; Crawford came to his house that afternoon about three o'clock. He went with Crawford then up Pennington creek, both on horseback. Jim Crawford was drinking. They proceeded a little way, and Crawford went to the creek to get a drink. While he was there, they heard loud talking, and Jim said, "There is Mr. Dykes." He got on his horse then and started across the creek and appeared to be in a sort of a hurry; witness followed on after him. Witness was behind Jim Crawford as they rode up. Dykes and Campbell Henderson and Monroe Wolfe were there. Monroe Wolfe was crying and Dykes said he guessed he would get a switch and give him a licking. Monroe Wolfe then went over near Jim Crawford's horse, and Jim reached over and shot them. Then they went off a little ways, and Jim asked what they were going to do to get him out of it, and Dykes said he had no way to suggest, but to take it on himself. Jim said, "Let's go back there, I want to be sure whether Campbell is dead or not." He walked to where they were, and came back and overtook them. Campbell Henderson fell forward when he was shot. Witness had no idea when he started that Dykes and the Indians were there. Neither Henderson nor Wolfe had a six shooter. Dykes had a pistol.

The state had no eye witnesses to the homicide. Its case must of necessity rest on circumstantial evidence and the various admissions of the plaintiff in error, made to the officers and to his close friends. It appears from the testimony that as soon as the plaintiff in error had returned to his home at Tishomingo he called first upon his local banker and then other friends, to whom he made a statement that he had killed two Indians, and detailed the circumstances to some extent. These statements, voluntarily made at the time and place they were made, together with all the facts and circumstances in evidence, were to be considered by the jury, as likewise are the statements testified to by Standifer and the plaintiff in error when they were

on the witness stand. Under proper consideration of all these things, the jury was called upon to decide and when decided, say by their verdict whether or not Dykes killed the Indians or was concerned in the killing of them as a principal. The proposition of whether or not Dykes was an accessory after the fact rather than a principal in the murder, was not submitted to the jury, and no request was made by counsel for the defense that this be done.

There are only two questions in this case that require consideration. The first is based upon the contention that the court wrongfully permitted the introduction of testimony which tended to establish the commission of other offenses by the accused than the one for which he was being tried. The other question is based upon the refusal of the court to permit the introduction of proof by the accused to the effect that another person, to wit, one Crawford, had confessed to other persons that he fired the shots which ended the existence of Monroe Wolfe and Campbell Henderson, and that no other person was concerned therein.

Under the first proposition counsel for plaintiff in error rely on the doctrine laid down by this court in *Williams v. State,* 4 Okla. Cr. 523, 114 Pac. 1114, and *Vickers v. U. S.,* 1 Okla. Cr. 452, 98 Pac. 467. These two cases do not support the contention of counsel. The universal rule is, and the doctrine of those cases also is, that testimony which tends to show intent or malice upon the part of the accused, or which tends to identify him, or which is part of the *res gestae,* may be admitted even though such testimony establishes or tends to establish the commission of separate and distinct offenses. In *Son v. Ter.,* 5 Okla. 526, 49 Pac. 723, the Supreme Court of Oklahoma Territory said:

"Motive to commit crime, if shown, may in many cases be sufficient alone, almost, to induce a belief of guilt. Upon the other hand, where no motive for the commission of a crime can be shown, it is almost impossible to convince the mind of guilt. Men do not ordinarily commit grave crime unless there is in

their minds a motive strong enough to overcome the natural repugnance against crime, and the fear of punishment which usually follows detection. This view of this question is so universally recognized as being true, that it has become incorporated into the law, and in almost all cases where the guilt of a defendant depends upon the facts and circumstances in proof in the case, the court instructs the jury to consider the motive or lack of motive which the proof shows may or may not exist in the mind of a defendant on trial charged with crime."

See, also, *Myers v. State*, 6 Okla. Cr. 389, 119 Pac. 136.

It was the theory of the state in this prosecution that the plaintiff in error killed or participated in the killing of the two Indians because they had permitted certain persons to establish a mining camp upon lands which had been leased by them to the plaintiff in error, prior to the establishment of the camp, and very much against the wishes of plaintiff in error. Also that the homicide grew out of that transaction.

The proof shows that the plaintiff in error and his two employees, Crawford and Standifer, and especially the plaintiff in error and Crawford, had gone out to the mining camp and cut down the tents, destroyed the property, ordered the persons owning the tents, etc., to leave the premises and not to be again found thereon. The plaintiff in error had also complained to the Indians about their permitting the mining camp to be established, and had given them whisky upon which he and they became beastly intoxicated; and while in this condition a row was precipitated in which he participated and the two Indians were killed.

We are of opinion therefore that the evidence was admissible. The fact that it tended to prove other and independent crimes, so long as it was admissible to show motive, could not operate to preclude the state from the benefit thereof. As a general rule, any fact is admissible in evidence which tends to shed light on the intention of the person accused of committing the crime for which he is on trial, even though it may establish or tend to establish separate and independent crimes.

Of course this rule contemplates that testimony of this character must have substantive value for the purpose it is offered

Upon the second proposition we are unable to conclude that the position of counsel for plaintiff in error should be sustained. Their argument is supported by only a few authorities; in fact the great weight of authority almost uniformly supports the contrary doctrine. This identical principle is fully discussed by the Supreme Court of the United States in an opinion handed down on the 7th day of April, 1913, subsequent to the filing of the appeal in this case. The opinion was rendered in the case of *Donnelly v. United States,* 228 U. S. 243. We quote with approval from the discussion of this proposition in that opinion the following:

"The only remaining question arises out of the exclusion by the trial judge of testimony offered by the plaintiff in error for the purpose of showing that one Joe Dick, an Indian, since deceased, had confessed that it was he who had shot Chickasaw. Since the circumstances of the crime, as detailed in the evidence for the government, strongly tended to exclude the theory that more than one person participated in the shooting, the Dick confession, if admissible, would have directly tended to exculpate the plaintiff in error. By way of foundation for the offer, plaintiff in error showed at the trial that Dick was dead, thereby accounting for his not being called as a witness, and showed in addition certain circumstances that, it was claimed, pointed to him as the guilty man, viz., that he lived in the vicinity and therefore presumably knew the habits of Chickasaw; that the human tracks upon a sand bar at the scene of the crime led in the direction of an acorn camp where Dick was stopping at the time, rather than in the direction of the home of the plaintiff in error; and that beside the track there was at one point an impression of a person sitting down, indicating, as claimed, a stop caused by shortness of breath, which would be natural to Dick, who was shown to have been a sufferer from consumption.

"Hearsay evidence, with a few well recognized exceptions is excluded by courts that adhere to the principles of the common law. The chief grounds of its exclusion are, that the reported declaration (if in fact made) is made without the sanction of an oath, with no responsibility on the part of the declar-

ant for error or falsification, without opportunity for the court, jury, or parties to observe the demeanor and temperament of the witness, and to search his motives and test his accuracy and veracity by cross-examination, these being most important safeguards of the truth, where a witness testifies in person, and as of his own knowledge; and, moreover, he who swears in court to the extra-judicial declaration does so (especially where the alleged declarant is dead) free from the embarrassment of present contradiction and with little or no danger of successful prosecution for perjury. It is commonly recognized that this double relaxation of the ordinary safeguards must very greatly multiply the probabilities of error, and that hearsay evidence is an unsafe reliance in a court of justice.

"One of the exceptions to the rule excluding it is that which permits the reception, under certain circumstances and for limited purposes, of declarations of third parties made contrary to their own interest; but it is almost universally held that this must be an interest of a pecuniary character; and the fact that the declaration, alleged to have been thus extra-judicially made, would probable subject the declarant to a criminally liability is held not to be sufficient to constitute it an exception to the rule against hearsay evidence. So it was held in two notable cases in the House of Lords—*Berkley Peerage Case* (1811), 4 Camp. 401; *Sussex Peerage Case* (1844), 11 Cl. & Fin. 85, 103, 109, 8, Eng. Reprint, 1034, 1042—recognized as of controlling authority in the courts of England.

"In this country there is a great and practically unanimous weight of authority in the state courts against admitting evidence of confessions of third parties made out of court and tending to exonerate the accused. A few of them (*West v. State,* 76 Ala. 98; *Davis v. Commonwealth,* 95 Ky. 19; and *People v. Hall,* 94 Cal. 595, 599) are precisely in point with the present case, in that the alleged declarant was shown to be deceased at the time of the trial. In *West v. State* the defendant offered to prove by a witness that he heard one Jones say on his death bed that he had killed Wilson, the deceased. The Supreme Court sustained the ruling of the trial judge excluding the evidence. In *Davis v. Commonweath,* the offer excluded was to prove by a witness that one Pearl confessed to him on his death bed that he had killed the person for whose murder Davis was on trial. The Court of Appeals of Kentucky affirmed the conviction. In

*People v. Hall, supra,* it appeared that defendant and one Kingsberry were arrested together for an alleged burglary, attempted to escape, were fired upon and wounded by one of the captors; that a physician was sent for to treat them, and that Kingsberry died from the effects of his wound before any complaint was filed against either of the parties. In his own behalf the defendant offered to prove that after a careful examination the physician was satisfied that Kingsberry's wounds were necessarily fatal, and that he so informed him at the time; that Kingsberry admitted to the physician that he fully realized that he was mortally wounded and was on the point of death, and had given up all hope of ever getting well; that he was conscious of death, and that thus having a sense of impending death, and without hope of reward, he made full, free, and complete confession to said physician in relation to this alleged crime, stating that he himself had planned the entire scheme, and that Hall had nothing to do with it and was not connected with the guilt and was in all respects innocent of any criminal act or intent in the matter, this evidence was excluded, and the Supreme Court of California sustained the ruling, saying: The rule is settled beyond controversy that in a prosecution for crime the declaration of another person that he committed the crime is not admissible. Proof of such declarations is mere hearsay evidence, and is always excluded, whether the person making it be dead or not (citing cases that are among those included in the note).

"We do not consider it necessary to further review the authorities, for we deem it settled by repeated decisions of this court, commencing at an early period, that declarations of this character are to be excluded as hearsay.

"*Mima Queen and Child v. Hepburn* (1813), 7 Cranch, 290, 295, 296, 297, was a suit in which the petitioners claimed freedom, and certain depositions were rejected by the trial court as hearsay. The court, speaking through Chief Justice Marshall, said:

" 'These several opinions of the court (meaning the trial court) depend on one general principle. The decision of which determines them all. It is this: that hearsay evidence is incompetent to establish any specific fact, which fact is in its nature susceptible of being proved by witnesses who speak from their own knowledge. * * * It was very justly observed by a great judge that 'all questions upon the rules of evidence are of vast importance to all orders and degrees of men; our lives,

our liberty, and our property are all concerned in the support of these rules which have been matured by the wisdom of ages, and are now revered from their antiquity and the good sense in which they are founded.' One of these rules is that 'hearsay' evidence is in its own nature inadmissible. That this species of testimony supposes some better testimony which might be adduced in the particular case, is not the sole ground of its exclusion. Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover combine to support the rule that hearsay evidence is totally inadmissible. * * * The danger of admitting hearsay evidence is sufficient to admonish courts of justice against lightly yielding to the introduction of fresh exceptions to an old and well-established rule; the value of which is felt and acknowledged by all. If the circumstance that the eye witnesses of any fact be dead should justify the introduction of testimony to establish that fact from hearsay, no man could feel safe in any property, a claim to which might be supported by proof so easily obtained. * * * This court is not inclined to extend the exceptions further than they have already been carried."

See also *Brown v. State*, 37 L. R. A. (N. S.) 345; 55 Sou. 961.

The following are a few of many other authorities supporting this doctrine: *Welsh v. State*, 96 Ala. 92, 11 So. 450; *Owenby v. State*, 92 Ala. 63, 2 So. 764; *Alston v. State*, 63 Ala. 178; *Woolfolk v. State*, 85 Ga. 69, 11 S. E. 814; *State v. Smith*, 35 Kans. 618, 11 Pac. 908; *State v. West*, 45 La. Ann. 928; 13 So. 173; *State v. Duncan*, 116 Mo. 288, 22 S. W. 699; *People v. Scharley*, 149 N. Y. 99, 43 N. E. 536; *State v. White*, 69 N. E. 158; *State v. Fletcher*, 24 Ore. 295, 33 Pac. 575; *Peck v. State*, 86 Tenn. 259, 6 S. W. 389; *Bacigalupi v. Comm.* (Ky.), 101 S. W. 311; *Mays v. State*, 72 Neb. 723, 101 N. W. 979.

We have read and re-read the record in this case and have carefully and thoroughly considered the briefs and arguments. It is the opinion of the writer that the plaintiff in error should have been convicted of murder or acquitted; but under the doctrine laid down in *Ryan v. State*, 8 Okla. Cr. 623, which has become the settled rule in this state, a reversal cannot be had upon that ground.

The question of whether or not the plaintiff in error was guilty of this murder or an accessary after the fact, was one for the jury. The testimony being conflicting, and no error of law complained of, this court will not interfere with the conviction.

The judgment of the trial court is affirmed.

DOYLE, P. J., concurs; FURMAN, J., absent.