## BENNY FACTOR v. STATE.

No. A-4427.   Opinion Filed Sept. 30, 1924.
(229 Pac. 154.)

(Syllabus.)

1.   **Evidence—Accused not Entitled to Introduce Proof of Another's Confession.** A defendant on trial on a criminal charge ·is not entitled to introduce evidence to show the jury that some other person has confessed that he committed the crime, and that the defendant had nothing to do therewith and was not concerned therein.

2.   **Same—Extrajudicial Confession of Codefendant Inadmissible.** The extrajudicial confession of a codefendant, not on trial, that he had committed the murder charged, is not admissible in evidence in behalf of the defendant on trial.

3.   **Appeal and Error—Trial—Credibility of Witnesses and Weight of Evidence for Jury—Verdict on Conflicting Evidence not Dis-**

turbed. The jury are the exclusive judges of the credibility of the witnesses and the weight of the evidence, and a verdict on conflicting evidence, warranted by the testimony of the state, will not be disturbed on appeal.

4. **Homicide—Evidence Sustaining Conviction for Murder.** In a prosecution for murder, evidence held to justify a conviction of murder with imprisonment for life as the punishment.

Appeal from District Court, Seminole County; John L. Coffman, Judge.

Benny Factor was convicted of murder, and he appeals. Affirmed.

W. W. Pryor and W. N. Stokes, for plaintiff in error.

George F. Short, Atty. Gen., and J. Roy Orr, Asst. Atty. Gen., for the State.

DOYLE, J. The information in this case charges that Benny Factor, Barney Factor, Wilsey Harjo, Wilson Jones, and Clarence Payne did kill and murder one Lon Phelps. Upon his separate trial the jury returned their verdict finding the defendant Benny Factor guilty of murder, and assessing his punishment at imprisonment for life. He has appealed from the judgment rendered upon such conviction.

It appears that when the case was called for trial, on motion of the county attorney, the case against the defendants Wilson Jones and Clarence Payne was dismissed.

The undisputed facts are that on the night of the 15th day of December, 1921, there was a dance at the home of Cheparney Harjo, near Sasakwa, Seminole county. Lon Phelps, deceased, the defendants named in the information, and many others were there. Shortly after the dance ended, appellant Benny Factor, Wilsey Harjo, Wilson Jones, and Clarence Payne left Cheparney's place together, going south on the section line. Lon Phelps, deceased, left Cheparney's place a short time before these defendants left. The dead

body of Lon Phelps was found the next morning about half a mile south of Cheparney's, near where the section lines intersect. A charge of shot had entered his right breast, and a part of his head had been knocked off and his brains knocked out; there was a part of the stock of a shotgun lying partly under his body and two or three other pieces of the gun stock lying near by. An empty 16-gauge shell was picked up on the road close to the body. The deceased lived with his wife and two children not far from where his body was found.

Cheparney Harjo testified that after the dance had broken up, right around 11 o'clock, he heard a gun fire; that the next morning near the intersection of the section lines, south of his home, he saw the dead body of Lon Phelps.

Lula Harjo, wife of Cheparney Harjo, testified that she saw Lon Phelps leave about 10:30; that about 11 o'clock she heard a gun fire.

Abraham Davis testified that he saw the defendant Benny Factor, Wilsey Harjo, Wilson Jones, and Clarence Payne leave Cheparney's about 10:30, and they went south together.

Jim Taylor testified that he did not go to the dance, but his wife, Jennie Davis, did; that she got home about 10 o'clock; that his house is not very far from where Lon Phelps' body was found; that after his wife came home he heard persons talking down there in the road, and the only voice he recognized was that of the defendant Benny Factor; that shortly after he heard a gun fire.

His wife testified that Cheparney Harjo's wife, Lula, was her daughter, and she went to the dance with her mother; that after they got home she heard talking down there in the road and recognized the defendant Benny Factor's voice; that she knew his voice, that not very long af-

ter she heard a shot fired. On cross-examination she stated she heard Benny Factor say, "Don't do that, turn him loose and let him go," and that was all she heard him say.

Clarence Payne testified that he went to the dance with Benny Factor, Barney Factor, and another fellow; they were in a wagon, and he was on horseback; that he rode part of the way in the wagon, leading his horse; that he left the dance with Wilson Jones and Benny Factor; that he rode on the same horse with Wilson Jones, and Benny Factor was riding witness' horse; that he did not see Wilsey Harjo get on his horse with Benny Factor; that he and Wilson Jones were riding in front, and he did not look back; that they met Lon Phelps, just spoke, and passed on, then heard Lon Phelps and Benny Factor having some words back there; that he stopped them from fighting and told Benny Factor to come on, and Benny Factor rode on; that it was not very far to the corner; there Benny Factor went south, and he and Wilson Jones went west and on to Benny Factor's house; that when they arrived at Benny Factor's house he was there.

Cora Harjo testified that she was at the dance and returned home about 10 o'clock; that Benny Factor came to her house and asked for a gun, and he took the gun and ran back with it, and she and her mother followed him out to the section line; that she saw Benny Factor strike a man that was down; that he struck him seven or eight times; that he was striking him with the breach of the gun; that just before that she heard a gun fire. On cross-examination she stated that she was the wife of codefendant Wilsey Harjo; that she returned from the dance with her mother; that she found her husband that night near the Indian graveyard, and he was drunk; that she and her mother carried him home.

Sallie Hullway testified that she went to the dance with her daughter, Cora Harjo, and returned home with her; that Benny Factor come to the house after the gun; that she tried to take the gun away from him, and he took it from her and ran off with it; that she followed him and heard a shot fired, and after the gun fired she saw him hit some one; that when she was going back he overtook her riding a horse and asked her to be his witness, and she did not give him any answer; that she went on and returned with her daughter, and they found her son-in-law, Wilsey Harjo, over near the graveyard, and he was drunk; that Barney Factor came to her house that night and she got up and let him in.

On the part of the defense, Marchie Factor, the defendant's father, testified that four or five days after Lon Phelps was killed he met Cora Harjo and Sallie Hullway in Holdenville and had a conversation with them, in which each told him they were going to tell that Benny Factor killed Lon Phelps and the other boys would get out of it, and that in the same conversation they stated that they knew nothing whatever about the killing.

Bessie Factor, the defendant's mother, testified that at Sasakwa on the day of the preliminary examination she had a conversation with Cora Harjo and Sallie Hullway, and Sallie Hullway told her that she did not know who it was that killed Lon Phelps.

Dorsey Fixico testified that he was at the dance at Cheparney Harjo's, and saw Clarence Payne, Wilsey Harjo, Wilson Jones, and Benny Factor leave the dance; that he saw all four of them get on the horses; that he left there with Chappy Harjo and Sallie, and they took Barney Factor, who was drunk, to the wagon, and Abraham Davis and Wilsey Harjo put Barney into the wagon; that after going about a mile

Barney Factor got out of the wagon without saying a word, and he did not see Barney any more that night.

Barney Factor testified that he was at the dance at Cheparney's, but was so drunk that he did not know how he left there; that when he came to he was in a field close by the road; that he got up, looked around, and saw a house on the hill, and walked up there and found that it was Sallie Hullway's, where Cora and Wilsey Harjo lived; that he knocked, and Sallie Hullway came to the door; that it was probably 3 or 4 o'clock, he could not tell what time it was; that the next morning Wilsey Harjo asked him to help cut some wood, and he started with him up to Cheparney Harjo's to get a file to file the saw; that they were walking side by side when they came to the dead body, and witness said: "We had better give the news, some one dead here, because the hogs will destroy the body." And they went to Pete Bynum and told him about it; that Bynum phoned to Sasakwa and they stayed by the body until Bynum came back; that Wilsey Harjo picked up a pair of shoes and put them in his hip pocket, and after they had gone about 25 steps he took the shoes out of his pocket and threw them inside the fence, near the graveyard; when he picked them up he said: "These my shoes, ain't it."

The testimony of the defendant in his own behalf is as follows:

"I was at the dance at Cheparney Harjo's and left there about 10 o'clock with Clarence Payne, Wilsey Harjo, and Wilson Jones. I was riding behind Wilson Jones. Wilsey Harjo was riding behind Clarence Payne. We had two horses. About half a mile south we met Lon Phelps on the road. He was riding a mule. There was a conversation between Lon Phelps and Wilsey Harjo, and Lon Phelps jerked Wilsey Harjo off of his horse and kicked him around."

His further examination is as follows:

"At the time Lon Phelps and Wilsey Harjo were in this scuffle, there in the road, what, if anything, did you say to Lon Phelps, or Wilsey Harjo?

"By Mr. Adams: We object as incompetent, irrelevant, and immaterial.

"By the Court: Sustained.

"By Mr. Stokes: Give us an exception.

"Q. I believe you stated you heard the testimony of Jennie Davis in this case relative to what she heard you say in the section line down there? She heard your voice? A. Yes, sir.

"Q. Did you say the words there in the section line there at that time?

"By the Court: Wait a minute.

"Q. Did you state there at that time to Lon Phelps to turn him loose, he hasn't done anything?

"By Mr. Adams: We object; incompetent, irrelevant, and immaterial.

"By the Court: Overruled.

"By Mr. Adams: Exception.

"A. No, sir; I did not say it.

"Q. What was it that you did say?

"By Mr. Adams: We object as incompetent, irrelevant, and immaterial.

"By the Court: Sustained.

"Q. How long were you there in the road before you left? A. About five minutes.

"Q. Did you try to separate the boys, to keep them from having any fuss?

"By Mr. Adams: We object; incompetent, irrelevant, and immaterial.

"By the Court: Overruled.

"By Mr. Adams: Exception.

"A. No, I did not.

"By the Court: I will permit you to ask him if he testified to the things the other witnesses said he said.

"By Mr. Pryor: Now, you let the other witnesses testify to what he said.

"By the Court: Yes, of course.

"By Mr. Pryor: Now you are presuming that the very words used—

"By the Court: I can't permit him to say I said so and so. You can prove it by the witnesses if you want to.

"By Mr. Pryor: No, we can't prove it by other witnesses, because they would object to the statement; but put him on the stand and show him what he said at the time himself. The court I think has the rule confused.

"By the Court: No, you have the rule confused; the court is all right.

"By Mr. Pryor: I ask leave of the court at this time to make the record out of the hearing of the jury to show what this witness would testify to if permitted to answer.

"By the Court: The permission to make the record is denied, for the reason that the record is already made. Go ahead, gentlemen.

"By Mr. Pryor: We except.

"Q. Did you say anything to Lon Phelps and Wilsey Harjo at the time about stopping the racket?

"By Mr. Adams: We object.

"By the Court: Sustained.

"Q. Did Wilsey Harjo get back on the horse after the fuss? A. Yes, sir; I told him to get back on the horse, and he got back on.

"Q. You persuaded Wilsey and Phelps to stop the fuss there at the time?

"By Mr. Adams: We object; incompetent, irrelevant, and immaterial, and a conclusion.

"By the Court: Overruled.

"A. Yes, sir; I told them to stop the racket and get back on the horse.

"Q. And they did that? A. He got on behind Clarence Payne.

"Q. Did Wilsey Harjo afterwards get down off the horse again? A. Yes, sir; he fell off the horse after that, and I left him and went home.

"Q. Now, how far was that from the place where they had the fuss? A. Oh, it wasn't as far as from here to that west wall there.

"Q. Did you boys go on and leave him there? A. Yes, sir; we left him there and went on. We went south to the section line and turned west.

"Q. How far west did you go with Clarence Payne and Wilson Jones? A. Half a mile.

"Q. And then where did you go? A. I went south. I told them to wait there for me, and they did not wait; they went on west. Clarence Payne told me to ride over there and see if I could get any whisky to drink, and I went to get whisky and did not get any. Then I went home. Just a short while after I got there Wilson Jones and Clarence Payne came there.

"Q. Did you have a conversation with Wilsey Harjo, while he was in jail charged with this crime, about the killing of Lon Phelps, and, if so, when? A. Wilsey Harjo spoke to me about this murder the next day after Wilson Jones was released from jail.

"Q. Did he tell you Wilsey Harjo killed Lon Phelps?

"By Mr. Adams: We object; incompetent, irrelevant, and immaterial.

"By the Court: I will sustain the objection.

"Q. Have you been told by either one of the boys who were placed in jail charged with this crime as to who killed Lon Phelps? (Same objection. Overruled.) A. Yes, sir; I have.

"Q. Who? (Same objection. Overruled.) A. Wilsey Harjo.

"Q. Did he tell you who it was that killed Lon Phelps? (Same objection. Sustained. Exception taken.)

"By Mr. Pryor (out of the hearing of the jury): Comes now the defendant and offers to show by this witness, the defendant, that Wilsey Harjo, who is jointly charged with this crime, told this defendant, witness, that he himself killed the deceased, Lon Phelps, and that he knew that this defendant had nothing whatever to do with the killing of him; that this conversation took place in the county jail of Seminole county, Okla., two or three days after the preliminary hearing held in this case, and the next day after one of the defendants in this case, Wilson Jones, was released upon a bond and discharged.

"By the Court: Objection sustained. (Exception taken.)

On cross-examination he stated:

"I was riding Wilson Jones' black horse, and when they told me to see if I could get whisky, Clarence Payne loaned me his horse and we swapped horses. Then Clarence Payne got behind Wilson Jones on his horse. Wilsey Harjo was trying to get off the horse and fell off near the Indian graveyard. I went to Jess Steelman's to get the whisky. His house is a little ways, probably half a mile, west from Cora Harjo's. I did not go up where Lon Phelps' body was the next morning. I was arrested at my father's the next day, about 3 o'clock in the afternoon. I was going to Ada with

my wife the next day, so I had on different clothes. I did not have any money, and I asked Wilson Jones the next morning if he had any money, and he told me he did not.''

Three propositions are presented by the appellant's brief and assignment of errors:

''(1)    That the court erred in refusing to permit counsel for the defendant to make the record in the case; thereby keeping out of the record certain facts and statements made by the court and testimony offered on behalf of the defendant, and admitting testimony over the objections of the defendant.    (2)    That the court erred in its instructions given to the jury, in that said instructions as a whole are misleading and conflict with each other.    And (3)    that the verdict of the jury is not supported by the evidence and is against the law.''    .

Complaint is made of the rulings of the court in sustaining objections by the county attorney to questions propounded to the defendant as a witness in his own behalf whereby he was denied the right to tell his story as to what occurred and was denied the right to make the record.

There can be no question that the ruling of the court in sustaining the objections in question was erroneous, but it could not be prejudicial to the defendant, because the record shows he was afterwards permitted to testify fully as to what he said to Wilsey Harjo and Lon Phelps, the deceased, when they met in the road shortly before the killing occurred.

''The exclusion of evidence to prove particular facts is harmless, if the facts sought to be proved are subsequently proved by other evidence, and it is apparent that the evidence excluded could not have changed the result.'' Addington v. State, 8 Okla. Cr. 703, 130 Pac. 311; Rogers v. State, 9 Okla. Cr. 277, 131 Pac. 941.

Complaint is also made of the refusal of the court to permit the defendant to testify as to what his codefendant, Wilsey Harjo, told him in the county jail.

This testimony was properly rejected. It is the well-settled rule in this state that a defendant who is being tried on a criminal charge is not entitled to introduce proof which has for its purpose the establishing before the jury the fact that some other person has confessed that he committed the crime, and that the defendant had nothing to do therewith, and was not concerned therewith. Dykes v. State, 11 Okla. Cr. 602, 150 Pac. 84; Williams v. State, 13 Okla. Cr. 189, 163 Pac. 279; Klein v. State, 15 Okla. Cr. 350, 176 Pac. 414; McNeal v. State, 15 Okla. Cr. 555, 179 Pac. 479.

Counsel further complains as follows:

"We endeavored to save our objections and exceptions to the closing argument of the county attorney, and we set out only a small portion of what was said by the county attorney in his closing argument. We were up against the proposition of being denied the right to except, or make a record."

The record merely shows that during the argument of the county attorney, counsel for the defendant objected as follows:

"We object to what he says 'he was trying to do' not within the record.

"By the Court: Yes, sir; stay within the record.

"By Counsel: May it please the court he says this.

"By the Court: Now, gentlemen, I am not going to have any more interruptions. Go on with the argument."

We are forbidden to notice the alleged improper remarks of the county attorney because they were not incor-

porated in the record and made the ground of exceptions. In so far as the record shows, counsel for the defendant was not denied the right of having the court reporter take the entire argument, if they so desired. This counsel did not request, and for this reason the alleged improper argument cannot be reviewed by this court.

Some of the instructions are complained of. We have examined them all with care and find that they were as favorable to the defendant as the law would permit.

It is urged with apparent confidence that the evidence is not sufficient to warrant a conviction of this defendant.

This contention is predicated upon the fact that the main evidence against this defendant was given by two witnesses, the wife and mother-in-law of his codefendant, Wilsey Harjo.

While the evidence does not show who fired the fatal shot, it does show that this defendant was at the place where this brutal murder was committed a few minutes before the fatal shot was fired. The facts and circumstances leading to and during the altercation on the highway near the Indian graveyard where deceased, Lon Phelps, was murdered, cannot be known, because of the different versions of it by those present. There is no dispute but that the altercation was brought on in some way. The witness Clarence Payne testifies that it was between this defendant, Benny Factor, and the deceased, and that he stopped them from fighting. This defendant testifies that there was a quarrel and a fight between deceased, Lon Phelps, and his codefendant, Wilsey Harjo, and that he only acted as peacemaker.

This court has uniformly held that, where the inference of guilt can be reasonably drawn from the evidence, it will not interfere with the verdict on the ground of want of evi-

dence to support it. The jury are the exclusive judges of the credibility of the witnesses and the weight to be given their testimony. We think the testimony, without any doubt, is ample to sustain the conviction.

After a careful examination of the record we conclude that there was no error which could have been prejudicial to appellant; accordingly, the judgment is affirmed.

MATSON, P. J., and BESSEY, J., concur.