## TILSON O'DANE RUSHING v. STATE.

No. A-10778.   Nov. 10, 1948.

(199 P. 2d 614.)

See, also, 88 Okla. Cr. 95, 199 P. 2d 620.

Rutherford H. Brett and George Miskovsky, both of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, Tilson O'Dane Rushing, was charged, in the district court of Oklahoma county with the crime of burglary in the second degree after a former conviction of a felony, was tried, convicted of burglary in the second degree and sentenced to serve six years in the State Penitentiary, and has appealed.

The crime charged against the defendant was alleged to have been committed at the Redskin Theatre, in Oklahoma City, on September 17, 1945.   The defendant had two trials.   The first trial resulted in a hung jury.   At the second trial, the state presented the evidence of one Jack Toney, who, according to his testimony, was an accomplice of the defendant.   Toney did not testify in the first trial.

For a reversal of the case, it is contended that there is not sufficient corroboration of the testimony of the witness Toney to sustain a conviction; and second, the court committed error in denying the motion for new trial upon the ground of newly discovered evidence.

R. Lewis Barton, owner of the Redskin Theatre, testified that he discovered his place had been burglarized about 8:00 a.m. on September 17, 1945.   The closet door where his safe was kept was broken, the door was open, and a petty cash box had been removed from the closet to a desk, and papers from the box were scattered over the floor.   About $130 in cash and $10 in defense stamps had been taken from the box.   Barton testified that he had personally locked the office door the evening before when he closed the theatre.   An examination disclosed that an entry had been made in the theatre through the mezzanine floor.   A hole had been cut in the screen and the screen had been removed and was sitting on the floor. The witness further described how two slats had been re-

moved several weeks before from the door panel entering into the closet where he kept his safe by reason of the fact that he had locked the key to the door on the inside of the closet and that after the slats had been removed and an entry made, he had glued the two slats back into their original position. He further testified that these two slats had been removed the night of the burglary by the person who entered the closet door in order to reach their arm through and open the door from the inside of the closet. The witness notified the officers of the burglary and when they arrived they took photographs of the interior and made an examination of the slats for fingerprints.

He further testified that about 10:30 or 11:00 p.m. the night of the burglary, the defendant, Rushing, in company with the alleged accomplice, Jack Toney, came out of the theatre; that he shook hands with the defendant and the defendant introduced Toney to him and they conversed for two or three minutes.

On cross-examination Barton testified that defendant had been a patron of the theatre for about five years; that he often came into his office; that on September 14, 1945, he had cashed a $10 check for the defendant and was still holding the check at the time of the burglary.

J. M. Swofford and A. C. Myler testified to the taking of photographs of the interior and of certain fingerprints found on the slats removed from the closet door panel. Myler testified that he had compared the fingerprints removed from the slats with a print of defendant's in the records of the Police Department, and that in his opinion, the prints found on the door slats were those of the defendant. He pointed out to the jury on an enlarged picture of the fingerprints of defendant, and the finger-

print in controversy, fifteen points of similarity which in his mind established the definiteness of the fact that the fingerprints on the door were made by the defendant.

Robert Ewing testified that he was a police detective. He arrested defendant on September 19, 1945, at 4th and Broadway in Oklahoma City, in company with one Herbert Brennan Martin; that defendant was armed with a pistol and had a box of pistol shells in his pocket; that defendant also had in his possession $120.93 in money.

Jack Toney testified that he was 20 years of age and well acquainted with the defendant; that on September 16, 1945, about 8:30 or 9:00 p.m., he saw defendant at a beer parlor on Main street in Oklahoma City; that the defendant told him that he had in mind burglarizing the Redskin Theatre on Southwest 29th street; that the two of them left the beer parlor and went to the Redskin Theatre where they saw part of the show; that about 10:30 p.m. they came out of the show and defendant introduced Toney to Mr. Barton, the owner of the theatre, on the outside of Mr. Barton's office; that thereafter the defendant and Tony left the theatre and went across the street where they remained for several minutes; that later they climbed up in a tree and sat there for nearly an hour watching Mr. Barton put away his money; that they then went back in the theatre and stayed a short time before coming out and going back to town; that about 2:00 a.m. they returned to the theatre and entered through the back; that they went up to the front of the theatre and on upstairs where they heard the janitor sweeping the theatre; that the defendant, Rushing, closed the door from the lobby of the theatre to the office which made a noise and attracted the janitor; that when the janitor came to the office after hearing the noise, the witness and defendant left the theatre and went outside; that they

climbed on top of the building and waited, thinking maybe the janitor might have notified the officers after having heard the noise; that some time later they climbed up on a picket fence on the east side of the theatre, got up on the marquee, kicked in a screen, opened a window, and went in to the balcony; that Rushing then went to the office, removed two slats from the closet door inside the door where the money box was located; that Rushing opened the door to the closet, took some money and some war stamps; that Rushing then returned to where Toney was waiting and Toney went to the office and took some money; that they then left the theatre and caught a bus to Midwest City where they tried to break into the Skytrain Theatre, but could not effect an entry; that they then left the theatre and caught a bus back to the defendant's home where they arrived about 7:00 a.m.

Toney further testified that on Tuesday night, September 18, 1945, he met defendant near the Trianon ballroom; that defendant was in a car and called Toney over to the car, pulled a gun, stuck it into Toney's side and demanded the rest of the money; that it appeared more money was taken from the theatre than the defendant and Toney had admitted to each other had been taken. Toney testified that he appeased the defendant by convincing him that the janitor got the rest of the money and blamed it on the burglars.

The defendant's evidence was in the nature of an alibi. The proof of the defendant being that on the night in controversy, he was in his parent's home and slept in the same bed with one Corporal Gerald Sampson, a soldier in the United States Army. The parents of the defendant and the soldier each testified to this state of facts.

Reverend W. E. Cook identified certain exhibits which he received through the mail and stated that he had delivered the money contained in the letters to Mr. Barton, owner of the theatre. Objection by the state was sustained to the admission in evidence of the letters received by Reverend Cook through the mail.

Howard K. Berry, attorney of Oklahoma City, who represented defendant at his first trial testified that in September, 1945, the defendant owed him $100 ror money advanced on a bond, the defendant having testified that the money which the officer found on him at the time of his arrest was given to him by his father to take to Mr. Berry to pay him what was owed to him.

In an effort to explain the fingerprints found on the closet door, the defendant testified that on Sunday night, he went into the Redskin Theatre office for the purpose of using the telephone and while using the telephone pushed the closet door. The defendant further testified that he attended school at Capitol Hill High School on September 17, 1945.

In rebuttal the state introduced several witnesses who were employed at the Redskin Theatre and they each testified that they did not see the defendant use the telephone at the Redskin Theatre on the night of September 17, 1945, as he testified.

W. C. Haller, principal of the Capitol Hill High School, testified that the school records showed that defendant was absent from high school on September 17, 1945.

Jack Toney recalled as a witness testified that he came to the courthouse during the first trial, but Mrs. Rushing told him he should not be there as Mr. Barton might recognize him.

It was the contention of the defendant throughout the trial that Herbert Brannon Martin was the man who assisted in the burglary rather than the defendant, and several witnesses testified in rebuttal for the state in an effort to establish an alibi for Martin the night of the alleged burglary.

In construing the statute which requires the corroboration of the testimony of an accomplice (Tit. 22 O.S. 1941 § 742), certain principles of law have been definitely established. It is now well settled that the evidence corroborating the testimony of an accomplice need not cover every material point testified to by the accomplice, nor need it be sufficient alone to warrant a verdict of guilty, but if the accomplice is corroborated with respect to one material fact by independent evidence tending to connect defendant with the commission of the crime, the jury may infer that the accomplice speaks the truth, though such corroborated evidence must show more than the mere commission of the offense or circumstances thereof. Scott v. State, 72 Okla. Cr. 305, 115 P. 2d 763; Hathcoat v. State, 71 Okla. Cr. 5, 107 P. 2d 825; Howard v. State, 70 Okla. Cr. 165, 105 P. 2d 440; Blumhoff v. State, 72 Okla. Cr. 339, 116 P. 2d 212.

In Hathcoat v. State, supra, this Court stated:

"Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime; it is sufficient if it tends to connect him with its commission.

"Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only. * * *

"Where there is evidence in corroboration of an accomplice tending to connect a defendant with the commis-

sion of the crime charged, the sufficiency of such corroborating evidence is for the jury.

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

It is unnecessary to make a long discussion of this point raised by the defendant. The latent fingerprints of the defendant found on the slats removed from the door panel were sufficient alone to connect the defendant with the commission of the burglary. His explanation of his fingerprints on the slats which had been removed from the door panel raised a question for the determination of the jury. It is easy to understand why the jury refused to accept the explanation made by the defendant as to the reason for the appearance of his fingerprints on the slats. The defendant in using the telephone would have had no reason to close the door leading into the closet, and he would have had to stoop to touch the slats which were removed from the door. If the defendant was not the burglar who removed the slats from the door, then the burglar did not leave his fingerprints as the fingerprints of the defendant were the only ones the police fingerprint expert was able to remove from the slats. Aside from this, the defendant's presence with Toney at the scene of the crime shortly before its commission is a corroborative circumstance. The finding of the large amount of money on the defendant's person, together with the gun and shells, were also circumstances corroborative of the accomplice's testimony; but, the principal piece of evidence which alone is sufficient to corroborate the testimony of the accom-

plice is the definite establishment that the defendant's fingerprints were on the door slats which had been removed by the burglars in the office of the theatre.

Subsequent to the filing of the appeal in this court, and after obtaining permission from the Criminal Court of Appeals, counsel for defendant filed in the district court a supplemental motion for a new trial upon the ground of newly discovered evidence. This motion was predicated upon two letters addressed to the Reverend W. E. Cook of Oklahoma City, by some unknown person at Dallas, Texas. In each of the letters a sum of money was enclosed and the writer stated he was sorry that he had robbed the Redskin Theatre and asked the Reverend Cook to take the money which was enclosed in the letters and deliver it to Mr. Barton, the owner of the Theatre.

During the trial of the case, the Reverend Cook was called as a witness on behalf of the defendant and was permitted to testify to receiving the letters and to the fact that he delivered the money enclosed in the letters to Mr. Barton. However, objection was sustained by the court to the admission of the letters in evidence upon the ground that the letters were hearsay.

In the supplemental motion for new trial upon the ground of newly discovered evidence, it is alleged that subsequent to the conviction of defendant, Herbert Martin, while confined in jail, wrote a letter from the county jail of Oklahoma county to a girl in Oklahoma City, and that counsel for the defendant obtained the letter and delivered the letter, together with the letters addressed to Reverend Cook, to D. C. Patterson, an alleged handwriting expert in Oklahoma City, and that Mr. Patterson had made an examination of the letters and had come to the conclusion that the same person had

written all of the letters, thus establishing Herbert Martin as the writer of the letters to Reverend Cook.

Attached to the motion was an affidavit by Mr. Patterson, the alleged handwriting expert, in which he states that in his opinion the letter written by Herbert Martin to the girl friend in Oklahoma City and the letters addressed to Reverend Cook were written by the same person.

Counsel for defendant contend that the letters addressed to Reverend Cook proved a confession made by another person that they committed the Redskin Theatre burglary under circumstances which vouched for its authenticity and entitled it to admission in evidence.

This court has consistently held that such evidence is inadmissible. In the early case of Davis v. State, 8 Okla. Cr. 515, 128 P. 1097, it is held:

"When a defendant is on trial for a violation of the criminal laws of Oklahoma, confessions or admissions alleged to have been made by other persons are not admissible in evidence, either in behalf of the state or the defendant, except for the purpose of impeaching the credibility of witnesses upon proper predicates therefor."

In the body of the opinion Judge Furman stated:

"If evidence of this kind was admissible as original testimony for a defendant, it would be impossible to convict any thief, because he could always find witnesses who would testify that they had heard some one who was absent confess to being guilty of the crime. To hold that such evidence was competent would put a premium on fraud, make perjury safe, and place the state at the mercy of criminals. This would make a mockery of the law, and will not be permitted in the courts of Oklahoma."

In the case of Dykes v. State, 11 Okla. Cr. 602, 150 P. 84, the second syllabus reads:

"A defendant, who is being tried on a criminal charge, is not entitled to introduce proof which has for its purpose the establishing before the jury the fact that some other person has confessed that he committed the crime, and that the defendant had nothing to do therewith and was not concerned therein. For a discussion of this principle, see quotation in the opinion from Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, Ann. Cas. 1913E, 710."

To the same effect see State ex rel. v. Stanfield, 11 Okla. Cr. 147, 143 P. 519; Williams v. State, 13 Okla. Cr. 189, 163 P. 279; Factor v. State, 28 Okla. Cr. 78, 229 P. 154; Blackburn v. State, 28 Okla. Cr. 288, 230 P. 276; Johnson v. State, 33 Okla. Cr. 56, 242 P. 277, 278.

In Johnson v. State, supra, it is stated:

"The complaint that the court excluded material evidence offered by the defendant is based on the exclusion of certain questions asked the wife of the defendant on her examination concerning statements made by a codefendant. Although there was no offer of proof, by this evidence it was apparently sought to be shown that a codefendant, Caldwell, had a talk with one Parr with reference to hauling certain sugar which was stolen at the time of the burglary. In legal effect this would tend to prove that the codefendant, Caldwell, had confessed that he committed the burglary. It is generally held that such evidence is not admissible."

Under the principles of law announced in the above decisions, the letters would not be admissible in evidence except for the sole purpose of impeaching Herbert Martin if he had been a witness for the state and following the laying of a proper predicate for their introduction. The letters then would have been admissible for the pur-

pose of affecting the credibility of Martin, but they would not be admissible for the purpose of affecting the credibility of Jack Toney, or any other witness who testified for the state that Toney and Rushing committed the crime, their admissibility being limited to impeaching the credibility of the person who wrote the letters, if he is offered as a witness to show a contrary state of facts.

The most difficult matter for this court to determine is the question of the proper amount of punishment that should be inflicted upon this young offender. My associate, Judge Barefoot, has on this date affirmed the conviction by modifying the punishment received by the defendant in a companion case to a term of four years' imprisonment in the State Penitentiary. The punishment received by the defendant in this case will run consecutively with the term of imprisonment assessed in 88 Okla. Cr. 95, 199 P. 2d 620, decided by Judge Barefoot. We have come to the conclusion after an earnest and full consideration of all the facts and circumstances surrounding the case, including the youthfulness of the offender and other attendant circumstances, that justice would be served by modifying the sentence herein to a term of three years imprisonment in the State Penitentiary. Thus the defendant will have to serve a term of seven years' imprisonment as a total for these two offenses, unless sooner given executive clemency.

It is therefore ordered that the judgment and sentence of the district court of Oklahoma county be modified from a term of six years' imprisonment in the State Penitentiary to a term of three years imprisonment in the State Penitentiary and the judgment and sentence as thus modified is affirmed.

BAREFOOT, P. J., concurs. BRETT, J., not participating.