2007 OK CR 19

**James Dwight PAVATT, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2003–1186.

Court of Criminal Appeals of Oklahoma.

May 8, 2007.

M. Michael Arnett, Justin Lowe, Attorneys at Law, Oklahoma City, OK, attorneys for defendant at trial.

Fern Smith, Gayland Geiger, Assistant District Attorneys, Oklahoma City, OK, attorneys for the State at trial.

Gloyd L. McCoy, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Oklahoma City, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, attorneys for the State on appeal.

## OPINION

C. JOHNSON, Vice–Presiding Judge.

¶ 1 Appellant, James Dwight Pavatt, was tried by jury in the District Court of Oklahoma County, Case No. CF–2001–6189, for the crimes of First Degree Murder (21 O.S. 2001, § 701.7) (Count 1) and Conspiracy to Commit First Degree Murder (21 O.S.2001, § 421) (Count 2). The State alleged three aggravating circumstances in support of the death penalty on Count 1: (1) that the murder was especially heinous, atrocious, or cruel; (2) that the murder was committed for remuneration or the promise of remuneration; and (3) that the defendant constituted a

continuing threat to society. Jury trial was held August 25, 2003 through September 16, 2003 before the Honorable Susan Bragg, District Judge. The jury found Appellant guilty as charged on both counts, and recommended a sentence of ten years imprisonment and a $5000 fine on Count 2. In the capital sentencing phase of the trial, the jury found the existence of the first and second aggravating circumstances listed above and recommended a sentence of death on Count 1. On October 21, 2003, the trial court sentenced Appellant in accordance with the jury's recommendation, and Appellant timely lodged this appeal.

## FACTS

¶ 2 Appellant and his co-defendant, Brenda Andrew, were each charged with conspiracy and first-degree capital murder following the shooting death of Brenda's husband, Robert ("Rob") Andrew, at the Andrews' Oklahoma City home on November 20, 2001.[1] Appellant met the Andrews while attending the same church, and Appellant and Brenda taught a Sunday school class together. Appellant socialized with the Andrews and their two young children in mid–2001, but eventually began having a sexual relationship with Brenda.[2] Around the same time, Appellant, a life insurance agent, assisted Rob Andrew in setting up a life insurance policy worth approximately $800,000. Appellant divorced his wife in the summer of 2001. In late September, Rob Andrew moved out of the family home, and Brenda Andrew initiated divorce proceedings a short time later.

¶ 3 Janna Larson, Appellant's adult daughter, testified that in late October 2001, Appellant told her that Brenda had asked him to murder Rob Andrew. On the night of October 25–26, 2001, someone severed the brake lines on Rob Andrew's automobile. The next morning, Appellant and Brenda Andrew concocted a false "emergency," apparently in hopes that Rob would have a traffic accident in the process. Appellant persuaded his daughter to call Rob Andrew from an untraceable phone and claim that Brenda was at

---

1. Brenda Andrew was tried separately. She received the death penalty on the murder charge as well. Her direct appeal is presently before this Court in Case No. D–2004–1010.

2. The State presented evidence that the Andrews' marriage had been strained for several years, and that Brenda Andrew had a number of extramarital affairs.

a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. The plan failed; Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police.

¶ 4 One contentious issue in the Andrews' divorce was control over the insurance policy on Rob Andrew's life. After his brake lines were severed, Rob Andrew inquired about removing Brenda as beneficiary of his life insurance policy. However, Appellant, who had set up the policy, learned of Rob's intentions and told Rob (falsely) that he had no control over the policy because Brenda was the owner. Rob Andrew spoke with Appellant's supervisor, who assured him that he was still the record owner of the policy. Rob Andrew then related his suspicions about Appellant and Brenda to the supervisor. When Appellant learned of this, he became very angry and threatened to harm Rob for putting his job in jeopardy. At trial, the State presented evidence that in the months preceding the murder, Appellant and Brenda actually attempted to transfer ownership of the insurance policy to Brenda without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001.[3]

¶ 5 On the evening of November 20, 2001, Rob Andrew drove to the family home to pick up his children for a scheduled visitation over the Thanksgiving holiday. He spoke with a friend on his cell phone as he waited in his car for Brenda to open the garage door. When she did, Rob ended the call and went inside to get his children. A short time later, neighbors heard gunshots. Brenda Andrew called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. Brenda Andrew had also suffered a superficial gunshot wound to her arm. The Andrew children were not, in fact, packed and ready to leave when Rob Andrew arrived; they were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.

¶ 6 Brenda was taken to a local hospital for treatment. Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down. One witness saw Brenda chatting giddily with Appellant at the hospital later that night.

¶ 7 Rob Andrew was shot twice with a shotgun. A spent shotgun shell found in the garage fit a 16–gauge shotgun, which is a rather unusual gauge. Andrew owned a 16–gauge shotgun, but had told several friends that Brenda refused to let him take it from the home when they separated. Rob Andrew's shotgun was missing from the home when police searched it. One witness testified to seeing Brenda Andrew engaging in target practice at her family's rural Garfield County home about a week before the murder. Several 16–gauge shotgun shells were found at the site.

¶ 8 Brenda told police that her husband was attacked in the garage by two armed, masked men, dressed in black, but gave few other details. Brenda's superficial wound was caused by a .22–caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance as she ran from the garage into the house. About a week before the murder, Appellant purchased a .22–caliber handgun from a local gun shop. On the day of the murder, Appellant borrowed his daughter's car and claimed he was going to have it serviced for her. When he returned it the morning after the murder, the car had not been serviced, but his daughter found a .22–

---

**3.** According to one witness, Brenda had told her husband that she could sign his name "better than he could." Among other evidence, the State presented recordings of telephone conversations from Appellant and Brenda to the insurance company's home office, inquiring about the status of the policy and attempting to persuade them that a legitimate ownership change had been made.

caliber bullet on the floorboard. In a conversation later that day, Appellant told Larson never to repeat that Brenda had asked him to kill Rob Andrew, and he threatened to kill Larson if she did. He also told her to throw away the bullet she had found in her car.

¶ 9 Police also searched the home of Dean Gigstad, the Andrews' next-door neighbor. There they found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16–gauge shotgun shell was found on the bedroom floor, and several .22–caliber bullets were found in the attic itself. There were no signs of forced entry into the Gigstads' home. Gigstad and his wife were out of town when the murder took place, but Brenda Andrew had a key to their home. The .22–caliber bullet found in Janna Larson's car was of the same brand as the three .22–caliber bullets found in the Gigstads' attic; the .22–caliber bullet fired at Brenda and retrieved from the Andrews' garage appeared consistent with them in several respects. These bullets were capable of being fired from the firearm that Appellant purchased a few weeks before the murder; further testing was not possible because that gun was never found. The shotgun shell found in the Gigstads' home was of the same brand and odd gauge as the 16–gauge shell found in the Andrews' garage. Ballistics comparison showed similar markings, indicating that they could have been fired from the same weapon. Whether these shells were fired from the 16–gauge shotgun Rob Andrew had left at the home was impossible to confirm because, as noted, that gun also turned up missing.

¶ 10 In the days following the murder, Appellant registered his daughter as a signatory on his checking account, and asked her to move his belongings out of his apartment. He obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after the murder, Brenda and Appellant asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for the Andrew children to travel with Brenda out of the country. Brenda also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson could wire them money after they left town.

¶ 11 Brenda Andrew did not attend her husband's funeral. Instead, she and Appellant drove to Mexico, and took the Andrew children with them. Appellant called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down Appellant and Brenda. In late February 2002, having run out of money, Appellant and Brenda Andrew reentered the United States at the Mexican border. They were promptly placed under arrest.

¶ 12 At trial, the State also presented a letter purportedly from Appellant to one of the Andrew children, written after Appellant had been arrested. In the letter, Appellant claimed to have enlisted the help of another man to kill Rob Andrew, but claimed that Brenda had nothing to do with the plan. The State presented expert testimony that the handwriting of the letter was consistent in a number of respects with known exemplars of Appellant's handwriting. Appellant did not testify at trial. While defense counsel did not deny that Appellant and Brenda were having an affair, he challenged the State's claim that Appellant wrote the confession letter, and maintained that Appellant was not in any way involved in Rob Andrew's death. Additional facts will be discussed as relevant to Appellant's propositions of error.

## ISSUES RAISED ON APPEAL

### I. Appropriate standard of review.

¶ 13 In Proposition 1, Appellant claims that harmless-error analysis cannot be applied in this case. However, Appellant fails to explain why this is so as a general matter, without reference to any specific legal argument made on appeal. We have rejected such categorical claims of "harmless-error immunity" in the past. *See Stemple v. State*, 2000 OK CR 4, ¶¶ 70–76, 994 P.2d 61, 74. No trial is perfect, and the State and federal constitutions guarantee only a fair trial, not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460

(1986); *Stemple*, 2000 OK CR 4 at ¶ 73, 994 P.2d at 74. Under Oklahoma law, this Court is unable to grant relief unless the error complained of "has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right." 20 O.S.2001, § 3001.1. Whether an error occurred at all, and the likelihood that it affected the outcome of the trial, can only be determined by reference to the nature of the specific error alleged, the context in which it may have occurred, and the entire record of the trial proceedings. Proposition 1 is denied.

## II. Change of venue.

▇ ¶ 14 In Proposition 4, Appellant claims the trial court erred in not granting his request for a change of venue. Prior to trial, Appellant joined in a motion filed by his co-defendant seeking a change of venue due to extensive pretrial publicity. The trial court held a hearing on the motion January 9 and 21, 2003. The defense presented evidence of the extensive coverage of the case in the local media, as well as polling data showing that a substantial number of Oklahoma County residents were somewhat familiar with the case. After considering this evidence, the trial court denied the motion, stating:

> I don't think we're going to know [whether unbiased jurors can be seated] until such time as we bring in a large panel, put them up in the jury box and *voir dire* them. It's

unfortunate but that's actually the only way ... that you can make that determination.

▇ ¶ 15 We review the trial court's denial of Appellant's motion for change of venue for an abuse of discretion. *DeRosa v. State*, 2004 OK CR 19, ¶ 21, 89 P.3d 1124, 1135–36. Pretrial publicity alone does not warrant a change of venue. *United States v. McVeigh*, 918 F.Supp. 1467, 1473 (W.D.Okl. 1996) ("Extensive publicity before trial does not, in itself, preclude fairness"). The influence of the news media must be shown to have actually pervaded the trial proceedings. *Hain v. State*, 1996 OK CR 26, ¶ 8, 919 P.2d 1130, 1136. We consider all relevant evidence to determine whether a fair trial was possible at that particular place and time, keeping in mind the ultimate issue: whether the trial court was in fact able to seat twelve qualified jurors who were not prejudiced against the accused. *DeRosa*, 2004 OK CR 19 at ¶ 19, 89 P.3d at 1135 ("if a trial court denies a defendant's change of venue motion and the defendant is then tried and convicted, the question is no longer about hypothetical and potential unfairness, but about what actually happened during the defendant's trial").

¶ 16 Appellant cites several cases from other jurisdictions where a change of venue was granted, but he offers no analysis as to how those cases are relevant here.[4] He also relies on *Coates v. State*, 1989 OK CR 16, 773

4. All but one of the cases Appellant cites are procedurally distinguishable because they involve determinations made before *voir dire* was even attempted. *United States v. McVeigh*, 918 F.Supp. 1467, 1470 (W.D.Okl.1996) (trial court order granting change of venue; prosecution did not dispute the need for a change of venue, and disagreement was only over the more appropriate venue); *United States v. Engleman*, 489 F.Supp. 48 (D.Mo.1980) (trial court order granting change of venue); *State v. James*, 767 P.2d 549 (Utah 1989) (interlocutory appeal on change of venue). The posture of Appellant's case is different. He is raising the issue in the context of a direct appeal after conviction; and because the ultimate concern is an impartial jury, he must demonstrate that the jury actually empaneled to try him was not impartial. *See McVeigh*, 918 F.Supp. at 1470 ("Ordinarily, the effects of pre-trial publicity on the pool from which jurors are drawn is determined by a careful and searching *voir dire* examination"). The fourth case

Appellant relies on is *State v. Stubbs*, 84 P.3d 837 (Utah App.2004), where an appellate court found reversible error in the trial court's denial of a motion for change of venue. *Stubbs*, however, is factually distinguishable; the entire county had some 6000 residents, the alleged rape victim was from a locally prominent family, and *voir dire* actually demonstrated that acquaintance with members of the complainant's family and knowledge of the case was pervasive.

Appellant also notes that his alleged confession was reported in the press, which also occurred in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). But the confession disseminated in *Irvin* was only one of many factors which worked to deny the defendant a fair trial in that case. These factors resulted in actual prejudice in *Irvin*, as several jurors admitted that they could not presume the defendant to be innocent of the crime. This record in this case presents no such evidence of prejudice.

P.2d 1281, where we found error in the trial court's denial of a motion for change of venue. We see no parallels with *Coates,* however. The defendant in *Coates* was an elected public official, accused of embezzlement and other crimes directly related to the administration of her office. Therefore, all citizens of the county, and hence every juror, could have perceived themselves as "victims" of the alleged crimes. In fact, two prospective jurors in *Coates*—at least one of whom actually sat on the jury—had been directly affected by the case because checks they had written to the defendant's office had gone missing. *Id.* at ¶¶ 14–16, 773 P.2d at 1286–87. Likewise, cases from other jurisdictions have noted that a change of venue may be in order when the community from which the jurors would be drawn may perceive a personal stake in the proceedings.[5] Appellant does not argue such facts here, and we find none.

¶ 17 From the beginning, this case received more than considerable attention in the local media. That fact cannot be disputed. The case had all the necessary elements to make it ripe for media attention: sex, money, deception, and murder. Appellant refers us generally to the record of the hearing on his change-of-venue motion, but he does not articulate how an air of prejudice pervaded the trial proceedings themselves. Again, our chief concern is not how, or how often, the case played in the media, but whether, at the end of the day, the trial court was able to empanel twelve fair and impartial jurors.

¶ 18 The trial court is entitled to considerable discretion on issues involving jury selection, because it personally conducts *voir dire* and has the opportunity to observe the demeanor of the panelists—so much of which is lost in the transcription of the proceedings. *Harris v. State,* 2004 OK CR 1, ¶ 11, 84 P.3d 731, 741. The trial court excused a number of prospective jurors who admitted that pretrial publicity had affected their ability to be impartial. On the other hand, several panelists—including at least three who ultimately

sat on the jury—said they had heard nothing about the case. Each person who actually sat on Appellant's jury assured the court that he or she could fairly evaluate the evidence, and could consider all three punishment options if Appellant were found guilty. Nowhere in his brief does Appellant claim, much less demonstrate, that any juror actually seated was biased against him due to adverse pretrial publicity. Indeed, defense counsel waived his last peremptory challenge without comment, which we must interpret as satisfaction with the final makeup of the jury. The trial court did not abuse its discretion in denying a change of venue. This proposition is denied.

### III. Double jeopardy/double punishment.

¶ 19 In Proposition 6, Appellant claims that convictions for both First Degree Murder, and Conspiracy to Commit Murder, violate both the prohibitions against double jeopardy in the federal and state constitutions, as well as the prohibition against double punishment found in 21 O.S.2001, § 11. We disagree.

¶ 20 The double jeopardy clauses of the federal and Oklahoma constitutions afford protection from (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense imposed in the same prosecution. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). As interpreted in the third situation, applicable here, the "double jeopardy" ban simply prevents the State from punishing a person more harshly than the legislature intended. *See Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983); *Ellis v. State,* 1992 OK CR 35, ¶¶ 27–30, 834 P.2d 985, 990–91. Oklahoma statute defines and punishes conspiracy to commit crime separately from the completed crime, *see* 21 O.S.2001, § 421, and on numerous occasions we have interpreted Oklahoma law to punish an agreement to commit crime,

**5.** *See e.g. McVeigh,* 918 F.Supp. at 1470–72 (detailing how local citizenry was affected by bombing of the federal building in Oklahoma City); *James,* 767 P.2d at 554–55 (giving particular weight to the widespread community participation in the month-long search for the murder victim's body).

followed by an overt act in furtherance of that plan, separately from the completed crime itself. *See e.g. Harjo v. State*, 1990 OK CR 53, ¶ 17, 797 P.2d 338, 342; *Stohler v. State ex rel. Lamm*, 1985 OK CR 30, ¶ 4, 696 P.2d 1038, 1040; *McCreary v. Venable*, 86 Okl.Cr. 169, 190 P.2d 467 (1948).

¶ 21 Appellant relies heavily on *Stewart v. State*, 662 So.2d 552 (Miss.1995). In *Stewart*, the Supreme Court of Mississippi held that a defendant's conviction for both conspiracy to commit murder, and "murder for hire" as defined under Mississippi law, violated double jeopardy principles. Conceding that "[c]onspiracy and the underlying substantive offense are normally distinct and separate offenses," *id.* at 561, the *Stewart* court nevertheless observed that the particular variant of murder that the defendant was charged with required proof of an agreement to kill for money.

¶ 22 *Stewart* is inapposite here, and Appellant fails to recognize the differences between the statutory schemes of Oklahoma and Mississippi. In *Stewart*, the fact that the murder was a contract killing was an essential element of the crime, as defined by the Mississippi legislature. In fact, the *Stewart* court noted that the defendant could have properly been convicted of conspiracy to commit murder in addition to some other variant of murder under Mississippi law. *Id.* at 561. Oklahoma has no discrete "murder for hire" variant of homicide.

¶ 23 Appellant points out that the evidence of a conspiracy between himself and Brenda Andrew was an important part of the State's claim, in the *capital sentencing phase* of the trial, that the murder was committed for remuneration. This is true, but it does not mean that Appellant was twice placed in jeopardy for the same offense. In essence, Appellant claims that evidence of a separate criminal offense, presented in the guilt phase of a capital murder trial, cannot also be used as a factor supporting a death sentence for the murder. We have rejected similar claims in the past. *See Dodd v. State*, 2004 OK CR 31, ¶ 107, 100 P.3d 1017, 1048 (in prosecution for double murder, State was not estopped from using evidence of either victim's murder to support the "great risk of death to more

than one person" aggravating circumstance, alleged as to each murder in the punishment phase of the trial); *Martinez v. State*, 1999 OK CR 33, ¶ 76, 984 P.2d 813, 831 (rejection of same argument on double jeopardy grounds); *cf. Bowie v. State*, 1995 OK CR 4, ¶¶ 13–18, 906 P.2d 759, 762 (where defendant was on trial for one murder, State was not collaterally estopped from using evidence of a second unrelated murder to support capital aggravating circumstance that the defendant was a "continuing threat to society"). The fact that evidence of a plan to profit financially from Rob Andrew's murder was relevant to both the conspiracy charge, and the "murder for remuneration" aggravating circumstance supporting the death sentence for the murder charge, does not offend double jeopardy principles.

¶ 24 Finally, under these facts, convictions for both the conspiracy and murder do not violate Oklahoma's statutory ban on "double punishment." 21 O.S.2001, § 11. That statute, which bars multiple punishments based on a single act or omission, must be considered in conjunction with the legislative prerogative to define crimes in general, and with the applicable statutory enactments defining the conduct which constitutes the particular crimes at issue. The evidence in this case showed that Appellant and Brenda Andrew planned the murder, and acted on that plan many times, well in advance of actually consummating the killing. The anticipated receipt of the victim's life insurance proceeds may have been a motive to plan the murder, but it was not a fact critical to its commission. Then again, a financial motive to murder does not necessarily require any agreement with anyone else. Neither crime was an indispensable part of the other. The murder, and the plan to commit it, were not the "same act" as contemplated by 21 O.S.2001, § 11. *Stohler*, 1985 OK CR 30 at ¶¶ 5–6, 696 P.2d at 1040. Appellant was not subjected to either double jeopardy or double punishment, and this proposition is denied.

## IV. Issues relating to jury selection.

¶ 25 In Proposition 2, Appellant claims his jury was irreparably tainted by a comment on parole possibilities made by a

prospective juror. As we have already observed, the trial court is in a unique position to judge, first-hand, the demeanor and candor of the prospective jurors as *voir dire* is conducted. Thus we defer to the trial court's discretion in matters pertaining to jury selection, and review this claim only for a clear abuse of that discretion. *Harris*, 2004 OK CR 1 at ¶ 11, 84 P.3d at 741; *Douglas v. State*, 1997 OK CR 79, ¶ 16, 951 P.2d 651, 661.

¶ 26 During *voir dire*, Prospective Juror Walker was asked if he could consider all three punishments available for first-degree murder: life imprisonment (with the possibility of parole), life imprisonment without the possibility of parole, or death. Mr. Walker said he could not. The trial court asked for clarification:

> THE COURT: So you're telling me that irregardless [sic] of the law and irregardless [sic] of the facts and circumstances of the case you would not be able to impose the penalty of life imprisonment?
>
> PROSPECTIVE JUROR WALKER: Not if charged with murder in the first degree and convicted.
>
> THE COURT: Okay. And as you know, Mr. Pavatt is charged with murder in the first degree. So let me ask it just as you gave it to me. If you found him guilty as a juror, if the jury unanimously found him guilty of murder in the first degree could you impose a penalty of life imprisonment?
>
> PROSPECTIVE JUROR WALKER: With a chance that he would be on the street in ten years, no.

¶ 27 Defense counsel moved for a mistrial. He claimed that Mr. Walker's comment implied to the other panelists that he had "some specialized knowledge concerning when someone convicted of life imprisonment would be eligible or likely to receive parole." The trial court denied the motion, and refused to instruct the rest of the panel to disregard the comment. Mr. Walker was promptly excused for cause, without objection by the State.

¶ 28 Appellant claims that Mr. Walker's concerns about parole irreparably tainted the entire panel and, consequently, the jury that ultimately convicted and sentenced him. He insists that he is not required to prove prejudice under these circumstances. We disagree. Appellant was certainly entitled to a fair and impartial jury, one that could consider all available punishment options. U.S. Const. Amend. VI; Okla. Const. art. 2, § 20. But for the reasons explained below, the case law Appellant relies on is inapposite.

¶ 29 As an initial matter, we reject Appellant's claim that prejudice must be presumed in this situation. A presumption of prejudice arises when the jury is exposed to outside influence after it has retired for deliberations. *Johnson v. State*, 2004 OK CR 23, ¶ 20, 93 P.3d 41, 47; *Matthews v. State*, 2002 OK CR 16, ¶ 7, 45 P.3d 907, 913; *compare Edwards v. State*, 1991 OK CR 71, ¶¶ 12–15, 815 P.2d 670, 673–74 (no presumption of prejudice where juror suddenly realized, during trial, that she recognized a witness and went to the same church as the prosecutor). The presumption does not attach every time the *venire panel* is exposed to a comment by a prospective juror made during *voir dire*, particularly if the person making the comment is ultimately excused from service. Otherwise, every personal opinion expressed in *voir dire* could conceivably taint every venire panel, and make jury trials a virtual impossibility. The very purpose of *voir dire* (literally, "to speak the truth") is to explore the potential biases of prospective jurors, and excuse those whose biases prevent them from following the law. *Dodd*, 2004 OK CR 31 at ¶ 24, 100 P.3d at 1029. It is by necessity an open and frank exchange, and must continue to be so to ensure the defendant is judged only by impartial members of the community. Thus, we will not presume prejudice in this situation. Appellant must demonstrate that Mr. Walker's comment so affected the panelists who ultimately sat on his jury as to have denied Appellant a fair trial.

¶ 30 Turning to the heart of Appellant's argument, we have long held that speculation about the parole process is not a proper part of the jury's function in deciding appropriate punishment in a criminal case. *See e.g. Bell v. State*, 1962 OK CR 160, ¶ 18, 381 P.2d 167, 173 ("To permit the jury to project itself in

this manner into the executive branch of the government is clearly contrary to our constitutional concept of division of powers"). But in 1987, the Oklahoma Legislature amended our law to add "life without parole" (or, more accurately, life imprisonment without the *possibility* of parole) as a third punishment option for first-degree murder, alongside life imprisonment (with at least the possibility of parole) and death. Laws 1987, Ch. 196, § 1; *Salazar v. State,* 1993 OK CR 21, ¶ 32, 852 P.2d 729, 737. The purpose behind this amendment is plain: to permit the sentencer to bar a particular defendant from even the possibility of release in the future through parole, which is otherwise administered by the Oklahoma Pardon and Parole Board, a constitutionally-created body.[6] Thus, where parole ineligibility is an express part of a legislative punishment definition, the jury must necessarily consider the *possibility* of parole in deciding appropriate punishment. *See Mayes v. State,* 1994 OK CR 44, ¶ 136, 887 P.2d 1288, 1318 ("[W]hile we hold a jury may logically consider the possibility or absence of parole in determining the sentence a capital murder defendant is to receive, we also hold there is no requirement for a trial judge to explain the Oklahoma parole process to a jury"). By offering the jury the choice to bar parole eligibility altogether, the "life without parole" option works to curb juror speculation about such contingencies.

¶ 31 Appellant cites cases from various jurisdictions, including Oklahoma, where an empaneled jury or venire panel was tainted by some sort of information prejudicial to the accused. But the cases Appellant relies on generally involve either (1) comments from the trial judge or prosecutor to the jury about various methods of seeking post-trial relief from a sentence (such as parole, pardon, commutation, earning credits in prison, or the appellate process); (2) prejudicial information about the accused himself (such as the fact that he had prior convictions, or was awaiting trial for other crimes), before such had been properly placed into evidence; or (3) opinions or other comments to the jurors about the case, made outside of the trial proceedings, by a third party (judge, witness, spectator, etc.). We agree that these three types of situations can result in reversible error.[7] But none of these cases squarely addresses the situation presented here.

¶ 32 The subject of parole was broached during *voir dire* by a prospective juror, not by the prosecutor or the trial court. Mr. Walker's comment was not prejudicial information about Appellant, a potential witness, or any other aspect of the case. Appellant maintains that the comment implied some sort of first-hand knowledge about the parole process, *i.e.,* that a person serving a sentence of life with the possibility of parole would undoubtedly be "on the street" in ten years. This is an unreasonable interpretation. The comment merely expressed the panelist's concern about the *possibility* of parole, and his categorical inability to even consider a life sentence in any first-degree murder case. Mr. Walker referred to the *"chance"* that Appellant could be paroled in ten years—obviously indicating that neither he, nor anyone ultimately sitting on Appellant's jury, would have any control over that decision if a "straight" life sentence were imposed. But that concern is precisely why our Legislature

6. Okla. Const. art. VI, § 10. We continue to hold that the subject of parole is not germane to the jury's function, except to the extent that the Legislature has expressed a specific limitation on parole eligibility, as part of a statutory definition of punishment for a particular crime. *See Anderson v. State,* 2006 OK CR 6, 130 P.3d 273 (requiring juries to be instructed consistent with statute that bars those convicted of certain crimes from parole consideration until they have served 85% of their sentence, and noting that this information actually curbs jury speculation about parole).

7. *See e.g. Kovash v. State,* 1974 OK CR 26, ¶ 12, 519 P.2d 517, 522 (it is error for the trial court or counsel for either party to discuss parole or other possible reductions to sentence with the jury); *Harris v. State,* 1962 OK CR 15, 369 P.2d 187 (it is error to make reference to a defendant's prior felony convictions when the jury is concerned only with guilt or innocence, unless the defendant himself places them in issue); *Perry v. State,* 1995 OK CR 20, ¶ 26, 893 P.2d 521, 528 ("[A] trial court should not conduct communications with the jury outside the presence of counsel and the defendant during deliberations; nor should anyone communicate with the jury regarding the merits of the case prior to submission of the case to the jury") (footnotes omitted).

added "life without parole" as an intermediate punishment option for first-degree murder. Appellant does not refer us to a single case where an isolated comment about parole issues, by a member of the venire panel who was ultimately excused, so tainted the panel as to require reversal of a conviction or modification of sentence.[8]

¶ 33 As the State notes in its response, we addressed a similar claim in *Wade v. State*, 1992 OK CR 2, 825 P.2d 1357. In that capital case, a member of the venire panel told the trial court that she could not consider a life sentence, because "in Oklahoma a life sentence usually doesn't turn out that way." The panelist was excused from service, but the defendant moved for a mistrial, which was overruled. We found no error, noting that all jurors ultimately empaneled swore that they could be fair and impartial. *Id.* at ¶ 15, 825 P.2d at 1361–62.

¶ 34 In this case, the trial court stated that she did not perceive Mr. Walker's remark as anything but an opinion, and doubted that the rest of the panel would have considered it any other way. We defer to the trial court's own perceptions and experience in these matters. The trial court's decision not to draw further attention to the comment by admonishing the rest of the panel to disregard it, was not an abuse of discretion. *Tate v. State*, 1995 OK CR 24, ¶¶ 18–21, 896 P.2d 1182, 1188–89. Defense counsel himself could have questioned the rest of the panel to determine if the comment affected them, but chose not to. All of those who ultimately sat on Appellant's jury swore that they could be fair and impartial, and that they could consider all three punishment options available to them. After hearing the evidence, the jury did not even feel that life without the possibility of parole was the appropriate punishment. Appellant has failed to demonstrate any prejudice from the prospective juror's comment. This proposition is denied.

## V. Issues relating to the guilt-innocence phase.

### (a) Sufficiency of the evidence.

¶ 35 In Proposition 5, Appellant claims the evidence was insufficient to support either of his convictions. Appellant essentially claims that there is no direct evidence linking him to Rob Andrew's murder, or to any conspiracy to commit the murder. On issues of fact and witness credibility, we give substantial deference to the jury. When reviewing the sufficiency of the evidence to support a criminal conviction, we will only grant relief if, considering all of the evidence in a light most favorable to the State, no rational juror could have found the existence of all elements of the offense by proof beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Myers v. State*, 2000 OK CR 25, ¶ 39, 17 P.3d 1021, 1032.

¶ 36 Appellant claims there is no "physical evidence" or "forensic evidence" linking him to the crimes. He misapprehends the nature of evidence long held to be admissible and credible in a court of law. A

8. Appellant's reliance on *Mach v. Stewart*, 137 F.3d 630 (9th Cir.1997), is misplaced. In *Mach*, a prosecution for child sexual abuse, a prospective juror related her professional experience as a social worker dealing specifically with child victims of sexual abuse. During *voir dire* she expressed difficulty in being impartial, because sexual abuse had been confirmed in every case she had been professionally involved in. She made several statements to similar effect during further questioning before the entire panel. Even though the trial court eventually removed the panelist for cause, the Ninth Circuit Court of Appeals, on *habeas* review, found that her comments irreparably tainted the entire panel. The court's decision was based on "the nature of [the] statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times that they were repeated," as well as the fact that the case essentially boiled down to a credibility contest between the defendant and the complainant. None of these factors is present in this case. The isolated comment was not clearly based on any specialized, first-hand knowledge; it reflected only a general concern about the "chance" of parole; and the evidence in this case involved much more than a simple credibility contest. The Ninth Circuit has actually distinguished *Mach* on facts more similar to those in this case. *United States v. Uriarte–Perez*, 1998 WL 704102 (9th Cir.1998) (finding no tainted jury panel where panelist made a single comment related to the fact that guilty people sometimes proclaim their innocence; comment was not based on specialized knowledge, and panelist was immediately excused).

fingerprint at a crime scene may be considered "physical" or "forensic" evidence, though it is not direct evidence of a crime; rather, it is circumstantial evidence from which a jury can infer (in light of other circumstances) that the person with that fingerprint was present and participated in the crime. The same is true of DNA evidence. Both are circumstantial in nature, requiring an inference unnecessary for "direct" evidence, such as a witness's personal observation of a crime. That both fingerprints and DNA can be so compelling as evidence of guilt (or exoneration) attests to the powerful effect circumstantial evidence can have. *See generally Ex parte Jefferies*, 7 Okl.Cr. 544, 548, 124 P. 924, 925–26 (1912). In fact, classic sources of "direct" evidence—a confession, an eyewitness identification, the testimony of an informant or accomplice—are themselves the subject of special cautionary instructions and corroboration rules.[9] In the end, the law makes no distinction between direct and circumstantial evidence; either, or any combination of the two, may be sufficient to support a conviction. *Clark v. State*, 1983 OK CR 79, ¶ 8, 664 P.2d 1065, 1066; OUJI–CR (2nd) No. 9–4. The jury may consider all competent evidence, along with rules of law and basic common sense, in reaching a verdict.

¶ 37 Although Brenda Andrew was an eyewitness to her husband's murder, the State obviously did not believe that her account of two masked assailants was true. The State thus relied on evidence that Appellant and Brenda Andrew had several motives to murder Rob Andrew (money, dissolution of the Andrew marriage, control over the Andrew children), all related to the illicit affair that Appellant never disputed having with Brenda.

¶ 38 But the State's evidence demonstrated much more than motive. There was, in fact, a considerable amount of physical evidence, including bullets, shotgun shells, and forged documents, which linked Appellant to the murder and a pre-existing plan to get away with it. The testimony of Janna Larson,

Appellant's daughter, helped to show that Appellant and Brenda had planned to harm Rob Andrew for some time, and that the failure of their first attempt (by cutting the brake lines on his car) only emboldened them. Larson also related a number of incriminating statements from both Appellant and Brenda. Larson may not have been an eyewitness to the murder itself, but she was certainly an eyewitness to many overt acts of the two conspirators, and to their preparations for flight after the murder. The State also presented the letter written by Appellant from jail, wherein he admitted complicity in the murder but attempted to exculpate Brenda. Both parties rejected the letter as an accurate version of what happened, although obviously for different reasons. While the letter may have borne some relevance to show Appellant's complicity, it was perhaps more relevant to show how jealousy and greed can disfigure the human mind. Add to this the numerous other witnesses who spoke with and observed Rob Andrew, Brenda Andrew, and Appellant, as their relationships with one another evolved. In short, the evidence against Appellant was largely circumstantial, but that is not unusual in any kind of criminal case. What may be unusual was how large a quantity of circumstantial evidence the State was able to present.

¶ 39 All of the evidence presented at trial, when considered together, formed an intricate web of proof, from which any rational juror could find Appellant guilty of conspiring to murder Rob Andrew and consummating the murderous plan. *Plantz v. State*, 1994 OK CR 33, ¶ 39, 876 P.2d 268, 280. The evidence was sufficient to support both of Appellant's convictions. This proposition is denied.

**(b) Alternative-suspect evidence.**

¶ 40 In Proposition 7, Appellant claims he was denied his right to present a defense, specifically, evidence that someone else had confessed to killing Rob Andrew. After Ap-

---

9. *See* OUJI–CR (2nd) No. 9–19 (cautionary instruction regarding eyewitness identifications); OUJI–CR (2nd) No. 9–43 (cautionary instruction regarding informant witnesses); OUJI–CR (2nd) No. 9–28 (requirement that accomplice testimony be corroborated); OUJI–CR (2nd) No. 9–13 (requirement that a defendant's confession be corroborated).

pellant's trial had begun, defense counsel received a handwritten letter, purportedly from Zjaiton Wood, an inmate at the Oklahoma County Jail, confessing to the murder of Rob Andrew and detailing how he supposedly committed the crime. A similar letter was sent to the trial judge. Defense counsel filed a motion to endorse Wood as a defense witness, as well as two jailers who allegedly heard Wood make similar incriminating statements. The trial court held a hearing on the matter September 12 and 15, 2003.[10]

¶ 41 At the hearing, Wood appeared through counsel; he was in jail pending his trial on an unrelated capital murder charge. Wood's counsel strongly objected to her client being forced to testify concerning authorship and contents of the letters. After hearing argument from all parties, the trial court found the letters to be inherently untrustworthy, and refused to compel Wood to appear. Strangely, Appellant's defense counsel chose not to call the two jailers he had also moved to endorse as witnesses. Instead, counsel made an offer of proof that the jailers could testify to statements against penal interest that Wood made to them; that one jailer had seen other writings by Wood and believed the letters in question bore similar handwriting; and that Wood had actually handed the letters in question to one of the jailers and made an oral admission in conjunction therewith. The letters in question were admitted into evidence at the hearing, and are part of this appeal record.

■ ¶ 42 Appellant claims that the exclusion of the letters from his trial denied him his right to present a defense. The trial court has considerable discretion in deciding whether to admit or exclude evidence, and we review only for an abuse of that discretion. *West v. State*, 1990 OK CR 61, ¶ 16, 798 P.2d 1083, 1087. We are also mindful, however, that a defendant has a right to present competent evidence in his own defense, and that rules of evidence may not arbitrarily impinge on that right. *See Chambers v.*

*Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973).

■ ¶ 43 We first consider whether Appellant had a right to compel Wood to appear at the hearing and testify as to whether he wrote the letters. We find that he did not. Under the Fifth Amendment to the United States Constitution, and Article 2, § 21 of the Oklahoma constitution, no person can be compelled to give evidence which could tend to incriminate him. This privilege applies to anyone called as a witness, not just to the accused in a criminal trial; it is not limited to answers which would directly incriminate the witness in the instant proceeding, but extends to any incriminating consequences which would flow from compelled disclosure. *See Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973); *Morgan v. State,* 1976 OK CR 263, ¶ 5, 555 P.2d 1307, 1309; *Oklahoma Dept. of Public Safety v. Robinson,* 1973 OK 80, ¶ 25, 512 P.2d 128, 132–33. The trial court is vested with discretion to determine, from all relevant circumstances, whether certain information should be compelled. *Rey v. Means,* 1978 OK 4, ¶ 14, 575 P.2d 116, 120–21. Although an accused has a right to compulsory process for obtaining witnesses on his behalf, *see* Okla. Const. art. 2, § 20, he does not have the right to compel a witness to give testimony which could violate this privilege, or to compel attendance of a witness for the sole purpose of invoking the privilege. *Sherrick v. State,* 1986 OK CR 142, ¶ 6, 725 P.2d 1278, 1282; *Bryant v. State,* 1967 OK CR 196, ¶ 9, 434 P.2d 498, 500.

¶ 44 Applying these principles to the facts at hand, Appellant could not compel Wood's presence in court, as defense counsel's expressed purpose for doing so was to determine authorship of the self-incriminating letters. As Wood's defense counsel explained, her concern was that anything Wood said on the witness stand—even a refusal to answer due to a claim of privilege, outside the presence of a jury—might be used against him by

---

10. The trial court closed the courtroom to the press and spectators during this hearing, and directed that the transcript of the hearing be sealed. On appeal, the State sought and was granted permission to file its response to this

proposition separately and under seal. We now **FIND** no substantial reason for either the pertinent parts of the appeal record or the State's response to remain under seal, and hereby **ORDER** that they be unsealed.

the State in Wood's own capital murder trial. *See Messier v. State*, 1967 OK CR 84, ¶¶ 2–12, 428 P.2d 338, 340–41 (reversible error occurred where defendant was called to testify at her co-defendant's preliminary hearing, but invoked her privilege against self-incrimination, and the State subsequently used the defendant's invocation of privilege at that hearing against the defendant at her own trial).[11] The trial court understood these concerns, and declined to force Wood into that situation. We find no abuse of discretion on this point.

■ ¶ 45 Whether Appellant was denied the right to present a defense ultimately turns on whether the evidence at his disposal was admissible. Unable to compel Wood to incriminate himself under oath, Appellant was left with letters, purportedly written by Wood, confessing to Rob Andrew's murder. The trial court ruled that the letters themselves were not admissible at trial because they were inherently unreliable. On appeal, neither party addresses the applicability of section 2804(B)(3) of the Evidence Code, which defines certain exceptions to the rule barring hearsay, and states in relevant part:

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . .
>
> A statement which was at the time of its making contrary to the declarant's pecuniary or proprietary interest, or which tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, and which a

reasonable person in the declarant's position would not have made unless the declarant believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. . . .*

12 O.S.Supp.2002, § 2804(B)(3) (emphasis added).

¶ 46 Section 2804(B)(3) is clearly applicable in this situation.[12] There is no question that the letters in question contained statements against the author's penal interest. The putative author of the letters (Wood) was unavailable because he could not be compelled to testify. 12 O.S.Supp.2002, § 2804(A)(1); *Funkhouser v. State*, 1987 OK CR 44, ¶ 5, 734 P.2d 815, 816–17. Even assuming that Appellant could establish authorship of the letters, he was still required to establish (1) that a reasonable person in the author's position would not have made the statements if they were not true, and (2) corroborating circumstances which "clearly" indicate the trustworthiness of the letters. The trial court is not limited to gauging the credibility of an exculpatory statement by reference to the evidence supporting the State's theory. The court may, and indeed should, consider any relevant evidence—even evidence the State discounts—in determining whether the statement is trustworthy enough to be admissible.

¶ 47 The trial court had before it a number of facts which cast doubt on the letters' trustworthiness. As noted, Zjaiton Wood

11. Even if Wood refused to answer on Fifth Amendment grounds, the State might have attempted (improperly) to use adverse inferences from that refusal as evidence that he was a "continuing threat to society," and therefore deserving of the death penalty, in his own murder trial. *See* 12 O.S.1991, § 2513 (prohibiting any adverse inference to be taken from a witness's claim of evidentiary privilege). Of course, the fact that such inferences are improper under our Evidence Code does not mean they are never suggested by zealous counsel. *See e.g. Johnson v. State*, 1995 OK CR 43, ¶¶ 7–15, 905 P.2d 818, 821–23 (prosecutor's repeated questioning of co-defendant, resulting in repeated invocations of his Fifth Amendment privilege in front of the jury, denied defendant a fair trial).

12. Out-of-court statements, tending to exonerate the defendant and implicate the declarant, have traditionally been viewed with great suspicion. *See Dykes v. State*, 11 Okl.Cr. 602, 611–14, 150 P. 84, 87 (1915) (citing *Donnelly v. United States*, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913); *Peck v. State*, 86 Tenn. 259, 6 S.W. 389, 392 (1888)) ("To admit such [evidence] would be to overturn the well-settled rules of law which excludes [sic] hearsay; and would open the door to the most easily manufactured evidence. The admission is not part of the res gestae, is not made under oath, and can be made for the purpose of exculpating the defendant, and its falsity afterwards confessed, when it has accomplished the desired end. But it is needless to elaborate a principle so well settled by authority").

was himself awaiting trial on an unrelated charge of first-degree capital murder. He just happened to be housed in the same "pod" of the county jail as Appellant. The letters were handwritten but practically identical; that is, it appeared that one had been copied verbatim from the other, or that they had both been copied from another source. While the letters were detailed, they were perhaps *too* detailed, appearing to parrot certain key features of the State's case. The letters were mailed shortly after Appellant's trial began—after the State had publicly outlined the salient features of its case.[13] The trial court was also presented with information that Brenda Andrew had allegedly threatened a female witness who was to testify at one of the criminal proceedings against Wood, and that Wood had allegedly attempted to "confess" to other local murders besides this one. The trial court was entitled to consider all of this information in deciding whether the letters were presumptively credible enough to be admitted under § 2804. 12 O.S.2001, § 2103(B)(1); *Lee v. State,* 1983 OK CR 41, ¶ 6, 661 P.2d 1345, 1349.

¶ 48 In addition, the contents of the letters were inconsistent with other evidence, including some facts beyond the State's theory of the case. For example, while the letters claimed that the 16–gauge shotgun used to kill Andrew was left at the scene, no such weapon (or any weapon for that matter) was found in the vicinity. In fact, the 16–gauge shotgun used to kill Rob Andrew—which was the same unusual gauge of shotgun that Rob Andrew owned and had left in the home when he moved out—was never found. The letters claim that Wood acted alone in the murder, and this is inconsistent with both Brenda Andrew's own claim that *two* assailants attacked her husband, and the letter, written by Appellant, claiming that he enlisted another man to help him kill Rob Andrew. While the State obviously did not believe either account, the discrepancies between the letters purportedly written by Wood, and the defendants' respective versions of events, was something the trial court was entitled to consider in gauging the reliability of the letters.

¶ 49 Appellant refers us to *Gore v. State,* 2005 OK CR 14, 119 P.3d 1268, and *Holmes v. South Carolina,* 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), to support his claim that he was entitled, as a matter of due process, to present evidence of a possible third-party perpetrator. In *Holmes,* the Supreme Court found that a state evidentiary rule governing admissibility of third-party perpetrator evidence ran afoul of the Sixth and Fourteenth Amendment rights to a fair trial. The defendant in *Holmes,* charged with rape, burglary, robbery, and capital murder, proffered testimony suggesting that the forensic evidence against him had been contaminated and/or planted, and that another man, White, had admitted to the crime to several other people. White denied making any incriminating statements to others, and offered an alibi. The trial court excluded this evidence. The state appellate court affirmed, holding that third-party perpetrator evidence should be excluded any time the evidence against the defendant is "strong," particularly when there is "strong forensic evidence" of the defendant's guilt.

¶ 50 The United States Supreme Court found the rule applied by the state appellate court in *Holmes* to be too rigid. The Court pointed to several of its past cases, striking down similar rules that "serve[d] no legitimate purpose" or were "so disproportionate to the ends that they [were] asserted to promote."[14] *Holmes,* 547 U.S. at ——, 126

---

**13.** *See State v. Pierre,* 277 Conn. 42, 890 A.2d 474, 493 (2006) (for purposes of admitting a declarant's statement under hearsay exception for statements against penal interest, declarations made soon after the crime are generally more reliable than those made after a lapse of time, where a declarant has a more opportunity for reflection and contrivance).

**14.** *See Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (state law which barred defendants from presenting the testimony

of any co-defendant, unless the co-defendant had been acquitted, but imposed no such restriction on the prosecution); *Chambers,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (state "voucher rule" with prevented any party from impeaching its own witness); *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (court rule preventing defendant from introducing evidence, at trial, bearing on the credibility of his confession, after voluntariness had been determined by the court).

S.Ct. at 1732–33. Yet the Court recognized the authority of legislatures, and courts, to impose reasonable evidentiary rules in criminal trials, and noted that such authority—even regarding the admission of third-party perpetrator evidence—was not directly at issue. The only issue in *Holmes* was the South Carolina Supreme Court's recent expansion of its decades-old, judge-made rule, to make the admissibility of third-party perpetrator evidence entirely dependent upon the strength of the prosecution's evidence, considered in isolation. The Supreme Court found such a rule unconstitutional, in effect because it irrationally presumed that any evidence presented by the state was necessarily more credible than any evidence proffered by the defense.

¶ 51 In *Gore v. State*, this Court reversed a capital murder conviction because the defendant was barred from presenting an array of evidence that the murder might have been committed by others. *Gore* addressed what test should be applied to determine whether third-party perpetrator evidence is relevant and sufficiently material to be presented to a jury; but it did not hold that such evidence was immune from basic evidence rules. As we noted in *Gore*, a criminal defendant has a right to present evidence in his own defense, but must comply with the same evidentiary and procedural rules that are applicable to the State. *Gore*, 2005 OK CR 14 at ¶ 21, 119 P.3d at 1275.

¶ 52 The rule applicable here—12 O.S. § 2804(B)(3)—is nothing like the rule invalidated in *Holmes*. It permits the reliability of the hearsay statement to be judged by any relevant evidence, presented to the court on the preliminary question of admissibility. Nor is the situation here anything like the one in *Gore*, where the defense had an array of evidence, both direct and circumstantial, suggesting that someone else may have committed the crime. The letters purportedly written by Wood were not inadmissible merely because they were inconsistent with the State's theory; they were inadmissible

because there simply was nothing offered to corroborate them.[15]

¶ 53 A confession tends to be more trustworthy if it provides hitherto-unknown facts which are not only verifiable, but also consistent with known facts. The letters at issue fail both parts of this test. As explained in our discussion of Proposition 5, a substantial amount of evidence, both direct and circumstantial, from a variety of witnesses and other sources, coalesced into a web of proof strongly implicating Appellant in a murderous conspiracy to kill Rob Andrew. We fail to see how a jury could possibly have discounted all of this evidence in favor of a theory that Zjaiton Wood—with no known connection to anyone in this case—happened to drive up and murder Rob Andrew for his wallet, in his garage, using the same unusual gauge of shotgun that used to be in the Andrews' home but which is now nowhere to be found. Under these circumstances, the trial court did not abuse its discretion in either refusing to compel Wood to affirm or deny authorship of the letters, or in excluding the letters from the trial, pursuant to 12 O.S. § 2804(B)(3), as uncorroborated and unreliable. This proposition is denied.

### (c) Admission of gruesome crime-scene photographs.

■ ¶ 54 In Proposition 8, Appellant claims error when the trial court admitted several photographs of the murder victim at the crime scene. At trial, defense counsel objected generally to the "multitude of bloody photographs" from the crime scene that the State offered to introduce. These photographs depicted Rob Andrew's body on the floor of the garage. He bled to death after being shot twice at close range with a shotgun. The photographs showed the body from various angles. Appellant's objection at trial appears to focus more on the number of photographs rather than their gruesome nature. The trial court admitted many of the

---

**15.** *See Costa v. State*, 1988 OK CR 74, ¶¶ 4–5, 753 P.2d 393, 394–95 (trial court properly excluded statement of unavailable declarant, allegedly admitting homicide, as unreliable under § 2804(B)(3), where, *inter alia*, parts of the statement were inconsistent with other testimony, and the only witnesses to the alleged confession were the defendant himself and defendant's girlfriend).

photos but did sustain the defense objection to several others.

¶ 55 On appeal, Appellant does not claim the photographs were needlessly cumulative, only that they were gruesome, and therefore "had no place in the trial." We review the trial court's decision to admit crime-scene photographs for an abuse of discretion. *DeRosa*, 2004 OK CR 19 at ¶ 73, 89 P.3d at 1150. This Court has many times noted that gruesome crimes make for gruesome crime-scene photographs; the issue is whether the probative value of the evidence is substantially outweighed by its prejudicial effect. 12 O.S.2001, §§ 2401–03; *Dodd*, 2004 OK CR 31 at ¶ 66, 100 P.3d at 1038; *Le v. State*, 1997 OK CR 55, ¶ 25, 947 P.2d 535, 548. The State was entitled to corroborate and illustrate the testimony of its witnesses about what the crime scene looked like and the manner of death. The record shows that the trial court carefully considered each photograph before admitting it. We find no abuse of discretion here, and this proposition is denied.

### (d) Improper first-stage hearsay and opinion evidence.

¶ 56 In Proposition 3, Appellant claims error when a State's witness was allowed to interject hearsay and give his personal opinion of Appellant's guilt. Defense counsel timely objected to this testimony, so the issue was preserved for appellate review. *Hooks v. State*, 2001 OK CR 1, ¶ 16, 19 P.3d 294, 308; *Ullery v. State*, 1999 OK CR 36, ¶ 36, 988 P.2d 332, 349. We review the trial court's evidentiary rulings for an abuse of discretion. *West*, 1990 OK CR 61 at ¶ 16, 798 P.2d at 1087.

¶ 57 Janna Larson, Appellant's daughter, testified in the State's case in chief about her conversations with her father before and after Andrew's murder, and about her observations of her father's conduct. Appellant made incriminating statements to Larson, told her of his affair with Brenda Andrew, and enlisted her help at various times in his efforts to perpetrate the murder and avoid detection. After Appellant and Brenda left for Mexico, Larson contacted an attorney, and soon agreed to cooperate with the authorities. One officer that she worked closely with was Agent Kurt Stoner of the Federal Bureau of Investigation. Larson was understandably not happy about having to testify against her father at trial. She implied that she cooperated with authorities out of fear that she might be implicated in the murder if she did not. While not an entirely hostile witness for the State, Larson was led by defense counsel, in cross-examination, to opine several times that she did not believe her father was actually complicit in Rob Andrew's murder.

¶ 58 After Larson testified, the State called Agent Stoner to the stand. Stoner offered his version of Larson's cooperation in the investigation. Stoner described Larson as angry with her father and eager to cooperate with the authorities; he denied that Larson was ever threatened with prosecution if she did not cooperate. The prosecutor then attempted, several times, to impeach parts of Larson's testimony on this point by asking Stoner what Larson had told him about her father's involvement in the murders. Each time, defense counsel objected, and the trial court sustained the objection. We need not decide whether this would have been proper impeachment because the testimony was never adduced; Appellant's hearsay claim is unfounded. *Armstrong v. State*, 1991 OK CR 34, ¶ 24, 811 P.2d 593, 599.

¶ 59 The prosecutor then asked Stoner if, based on his law enforcement experience and involvement in this case, he had an opinion about Appellant's guilt. Defense counsel promptly objected, but before the court could rule on the objection, Stoner said he believed Appellant was "directly involved" in the murder. The trial court denied defense counsel's request for a mistrial. The record shows that the parties had discussed with the court, *in limine*, the possibility of one party opening the door to such evidence, and the prosecutor pointed out that the defense had just elicited the very same type of opinion testimony from Larson. The trial court admonished the jury to disregard any opinions about Appellant's guilt, whether from Larson or Stoner.

¶ 60 We have often held that an admonition to disregard inadmissible testimony is presumed to cure any possible error. *See, e.g., Al–Mosawi v. State,* 1996 OK CR 59, ¶ 59, 929 P.2d 270, 284. But given the situation presented in this case, we also find that any possible error was invited by the defense. *Hooper v. State,* 1997 OK CR 64, ¶ 20, 947 P.2d 1090, 1100. Just before Agent Stoner took the stand, defense counsel elicited Larson's opinion as to her father's innocence several times. Stoner was used to impeach several aspects of Larson's testimony, not just her opinion of her father's guilt. We do not condone counsel for either party gratuitously soliciting witness opinions as to what result the jury should reach. *See Littlejohn v. State,* 1998 OK CR 75, ¶ 16, 989 P.2d 901, 907; *Daniels v. State,* 1976 OK CR 189, ¶¶ 18–20, 554 P.2d 88, 94–95. However, we do not believe the opinions of either Larson or Stoner—each of whom had a potential bias—left a serious impression on the jurors, particularly after the trial court admonished them to disregard both. *See Malicoat v. State,* 2000 OK CR 1, ¶ 45, 992 P.2d 383, 404–05 (investigator's opinion that defendant intentionally abused child murder victim, uttered twice before trial court was able to rule on defense objection, was harmless, where court sustained objection and admonished jury to disregard opinion). This proposition is denied.

## VI. Issues relating to the capital sentencing phase.

### (a) Prosecutor misconduct.

¶ 61 In Proposition 9, Appellant contends that he was denied a fair trial by the prosecutor's arguments during the sentencing phase. Because Appellant did not object to any of these comments, we review them only for plain error. *Washington v. State,* 1999 OK CR 22, ¶ 40, 989 P.2d 960, 974. In Proposition 10, he claims that his trial counsel was ineffective for not objecting to these comments. We address these related issues together.

■■■ ¶ 62 First, Appellant complains of various comments that he describes as the personal opinions of the prosecutor. Appellant refers to the prosecutor's comments that

this was a "proper case for the death penalty"; that "there are no extenuating circumstances which mitigate the murder of Rob Andrew"; that this particular murder was "heinous, atrocious, or cruel"; that the jurors were "the only ones who can see that justice is done"; and, finally, that a death sentence was "the justice [Appellant] deserves."

■■ ¶ 63 Counsel enjoy significant latitude in arguing their respective positions, so long as the arguments are based on evidence the jury has received. *Washington,* 1999 OK CR 22 at ¶ 42, 989 P.2d at 974. A prosecutor's comments do not amount to improper "personal opinion" merely because she asks the jury to impose the death penalty. *See Bernay v. State,* 1999 OK CR 37, ¶ 65, 989 P.2d 998, 1014 ("A prosecutor may comment on the punishment to be given"). The prosecutor's arguments in this case as to why Appellant "deserved" the death penalty were based on her assessments of the evidence presented in court, and were entirely proper. *See Toles v. State,* 1997 OK CR 45, ¶ 65, 947 P.2d 180, 193 ("The prosecutor did not give his personal opinion of the death penalty; he argued why the death penalty was appropriate in this case").

■ ¶ 64 Appellant also claims that the prosecutor improperly engaged in speculation and evoked sympathy for the victim in the following passage:

When Rob Andrew lay dying on that garage floor, James Pavatt and Brenda Andrew looking at the sight that you see in those pictures, what do you believe his last words were? What do you believe he was trying to say when he was laying there on the floor looking up at Brenda Andrew's face? He was probably trying to say I love you, Brenda, because that's the kind of man he was.

Considering the evidence presented from the crime scene, and about Rob Andrew's feelings for his wife, this was actually a fair comment on the evidence. The prosecutor never suggested that the inference was based on anything the jury had not heard. *See Alverson v. State,* 1999 OK CR 21, ¶ 45, 983 P.2d 498, 514 (prosecutor's reference to murder victim as an "innocent man, trying to

make a living for his wife and two baby boys," was a proper comment on the evidence).

¶ 65 To the extent this comment may have evoked sympathy for the victim, we do not find it so outrageous as to have denied Appellant a fair sentencing proceeding. As the State had alleged that the murder of Rob Andrew was especially heinous, atrocious, or cruel, it was entitled to present evidence that Rob Andrew suffered extreme mental cruelty in conjunction with his death. *DeRosa*, 2004 OK CR 19 at ¶ 96, 89 P.3d at 1156. The evidence reasonably led to the conclusion that the last images Rob Andrew saw were of his wife and her lover working together to end his life. The prosecutor was entitled to suggest reasonable inferences about what Rob Andrew's last thoughts might have been, in order to establish the "heinous, atrocious, or cruel" aggravator. *See Alverson*, 1999 OK CR 21 at ¶ 46, 983 P.2d at 514 (prosecutor's asking the jury to imagine the feeling of a metal baseball bat hitting one's head was a permissible comment on the pain the victim may have felt prior to death); *Hooper*, 1997 OK CR 64 at ¶ 53, 947 P.2d at 1110 (prosecutor's statement that the murder victim "was immersed in a child's worst nightmare of being chased by an evil monster trying to kill her," and request that the jurors imagine what she went through, were based on the evidence presented and on the State's theory of how the victim died). We find no plain error in these statements.

¶ 66 Appellant's ineffective-counsel claim fails as well. To prevail on this claim, Appellant must demonstrate that (1) counsel acted in a professionally unreasonable manner by failing to object to the prosecutor's comments, and (2) a reasonable possibility exists that a different sentencing outcome would have resulted if counsel had objected. *Strickland v. Washington*, 466 U.S. 668, 687–89, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *Dodd*, 2004 OK CR 31 at ¶ 112, 100 P.3d at 1049. As we have found that the prosecutor's comments were not improper,

any defense objection to them would have been properly overruled and the ultimate outcome unchanged. Defense counsel was not ineffective for failing to object to comments which were not objectionable. *Short v. State*, 1999 OK CR 15, ¶ 85, 980 P.2d 1081, 1106–07. These propositions are denied.[16]

### (b) Victim impact testimony.

¶ 67 In Proposition 11, Appellant claims he was denied a fair sentencing proceeding by improper victim-impact testimony. Specifically, Appellant complains of a single comment made by E.R. Andrew, the victim's father: a request that the perpetrators of the murder "never walk free." Appellant reads this as a recommendation for punishment, and claims its prejudicial effect was exacerbated by the comment of a prospective juror during *voir dire* that he could not consider a life sentence with the possibility of parole (addressed in Proposition 2).

¶ 68 We have acknowledged that under 22 O.S.2001, §§ 984 and 984.1, those eligible to give victim impact testimony in a capital sentencing proceeding may give an opinion as to punishment. *Dodd*, 2004 OK CR 31 at ¶ 101, 100 P.3d at 1046; *Welch v. State*, 2000 OK CR 8, ¶ 46, 2 P.3d 356, 374. The only punishment options for First Degree Murder are life imprisonment, life imprisonment without parole, and death. 21 O.S.2001, § 701.9(A). Mr. Andrew's opinion that Appellant should "never walk free" cannot reasonably be construed to advocate for any of the available punishment options in particular. Appellant has failed to demonstrate any prejudice from the comment, either in isolation, or in conjunction with a single statement during *voir dire* by someone who was ultimately excused from the jury panel (see Proposition 2). Appellant did not object to the comment, and we find no plain error in it. *Lott v. State*, 2004 OK CR 27, ¶ 108, 98 P.3d 318, 346. This proposition is denied.

---

**16.** Within Proposition 11, Appellant makes a passing request that trial counsel be deemed constitutionally ineffective if this Court finds any other "harmful error" that he did not object to. Essentially, Appellant seems to be asking this

Court to search the record for additional arguments, which we decline to do. *Alverson*, 1999 OK CR 21 at ¶ 77, 983 P.2d at 520; *Armstrong*, 1991 OK CR 34 at ¶ 24, 811 P.2d at 599.

**(c) Damaging mitigation testimony.**

¶ 69 In Proposition 12, Appellant claims he was denied a fair sentencing proceeding by the testimony of one of his own mitigation witnesses. Appellant's step-father, Wade Veteto, was one of several witnesses called by the defense to ask the jury to spare Appellant's life. In his final comment to the jury, Veteto said, "Guess the only thing I can say to the jury is if there's any mercy in your heart please show it on my son." As defense counsel announced he had no further questions, Veteto added, "And if there ain't I hope God will show mercy on you." The witness then answered a number of questions posed by the prosecutor.

¶ 70 Appellant claims this last quoted statement prejudiced him, as the jurors were likely to have taken it as some sort of threat of divine retribution if they imposed a death sentence. Appellant cites cases which correctly hold that a prosecutor should not use religion to advocate a particular verdict or sentence.[17] We have applied that same principle to evidence sponsored by the State, *e.g.* victim impact statements in capital sentencing proceedings. *See Washington*, 1999 OK CR 22 at ¶¶ 60–62, 989 P.2d at 977–79. We find these cases inapposite, however, as the source of the comment in this case was a mitigation witness called by the defense. It is true that the comment was not solicited by counsel, and we appreciate the delicate nature of objecting to the comments of any victim-impact or mitigation witness. Still, we note that defense counsel did not seek to follow up with additional questions or ask the trial court to admonish the jury to disregard the comment. Thus, relief is not warranted unless the comment amounts to plain error. *Lott*, 2004 OK CR 27 at ¶ 108, 98 P.3d at 346. Having considered the entirety of the witness's testimony, we find no unfair prejudice, and hence no plain error. A few moments before making this comment, the same witness broke the tension of the courtroom with a humorous aside that made the jurors laugh. We detect nothing intimidating in the witness's testimony when read as a whole. This proposition is denied.

**(d) Ineffective assistance of counsel.**

¶ 71 In Proposition 13, Appellant claims trial counsel rendered deficient performance through a single comment made in punishment-stage opening statement:

> May it please the Court, Counsel, ladies and gentlemen of the jury. I think this task is probably one of the hardest for a defense attorney to do because it puts you in a position of talking to a jury that obviously didn't agree with your assertion of your defense. But nonetheless it's my obligation to stand here and to go over some of the same issues that we've had to talk about before.

We first consider whether counsel's comment was professionally unreasonable, and if so, whether there is a reasonable possibility that the comment affected the outcome of the punishment stage. *Strickland*, 466 U.S. at 687–89, 104 S.Ct. at 2064–65, 80 L.Ed.2d 674. Appellant contends that in this comment, defense counsel conceded that he was only advocating for Appellant out of obligation, and that the death penalty was a foregone conclusion. We disagree on both counts.

¶ 72 Counsel's comment was typical of those often seen in bifurcated trials (where the issue of punishment is reserved until after a finding of guilt), and in capital cases in particular. In those situations, the defendant and his counsel must eventually abandon the fight over guilt or innocence, accept the jury's verdict on that score, and move on to arguments related to punishment. The "obligation" counsel refers to in the quoted passage is clearly not an obligation to defend a person he believes his guilty or deserving of the death penalty. As we read the passage, counsel was simply reiterating his belief in his client's cause, and expressing disappointment that the jury did not share his belief.

---

17. *See e.g. Sandoval v. Calderon*, 241 F.3d 765, 775–780 (9th Cir.2000) (where prosecutor contended that the death penalty was sanctioned by God); *Fontenot v. State*, 1994 OK CR 42, ¶ 59, 881 P.2d 69, 85 (where prosecutor made Biblical references in closing argument); *Gibson v. State*, 1972 OK CR 249, ¶¶ 42–43, 501 P.2d 891, 900–01 (where prosecutor used "extensive recitation of Mosaic law" and "quotations from the New Testament" in closing argument).

¶ 73 Nor do we read counsel's comment as a concession that the death penalty was inevitable. Rather, counsel was asking the jurors to indulge his references to guilt-stage evidence, even though they had rejected the defense theory, because some of that evidence was relevant to punishment as well.[18] Far from being any sort of concession, counsel's comment evinced an unflagging determination to defend his client. Counsel's comment was neither unreasonable, unprofessional, nor prejudicial. *Strickland*, 466 U.S. at 687–89, 104 S.Ct. at 2064–65, 80 L.Ed.2d 674 (1984); *Kelsey v. State*, 1987 OK CR 206, ¶ 4, 744 P.2d 190, 191–92. This proposition is denied.

### (e) Sufficiency of evidence on aggravating circumstances.

¶ 74 In Propositions 14 and 15, Appellant challenges the sufficiency of the evidence to support the two aggravating circumstances alleged by the State as warranting the death penalty. Such challenges are reviewed under the same standard as challenges to the evidence supporting a criminal conviction. We consider the evidence in a light most favorable to the State, and determine whether any rational juror could have found the existence of the challenged aggravating circumstance beyond a reasonable doubt. *DeRosa*, 2004 OK CR 19 at ¶ 85, 89 P.3d at 1153; *Lockett v. State*, 2002 OK CR 30, ¶ 39, 53 P.3d 418, 430.

¶ 75 In Proposition 14, Appellant claims the evidence was insufficient to support the jury's finding that the murder of Rob Andrew was "especially heinous, atrocious, or cruel." To establish this aggravator, the State must present evidence from which the jury could find that the victim's death was preceded by either serious physical abuse or torture. Evidence that the victim was conscious and aware of the attack supports a finding of torture. *Davis v. State*, 2004 OK CR 36, ¶ 39, 103 P.3d 70, 81; *Black v. State*, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074 (evidence that victim consciously suffered pain during and after stabbing was

sufficient to support this aggravating circumstance); *Le*, 1997 OK CR 55 at ¶ 35, 947 P.2d at 550; *Romano v. State*, 1995 OK CR 74, ¶ 70, 909 P.2d 92, 118; *Berget v. State*, 1991 OK CR 121, ¶ 31, 824 P.2d 364, 373. Our evaluation is not a mechanistic exercise. As we stated in *Robinson v. State*, 1995 OK CR 25, ¶ 36, 900 P.2d 389, 401:

> As much as we would like to point to specific, uniform criteria, applicable to all murder cases, which would make the application of the "heinous, atrocious or cruel" aggravator a mechanical procedure, that is simply not possible. Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved. Unfortunately, no two cases present identical fact scenarios for our consideration, therefore the particulars of each case become the focus of our inquiry, as opposed to one case's similarity to another, in resolving a sufficiency of the evidence claim supporting the heinous, atrocious or cruel aggravator.

¶ 76 The evidence presented at trial showed that Rob Andrew suffered numerous wounds resulting from two shotgun blasts, which damaged his internal organs. The medical examiner testified that either wound would have caused sufficient blood loss to be independently fatal, but that death was not instantaneous. When emergency personnel arrived, Andrew was still clutching a trash bag full of empty aluminum cans, which reasonably suggested that he either tried to ward off his attacker or shield himself from being shot. Brenda Andrew called 911 twice after the shooting; together, the two calls spanned several minutes. During the second call, she claimed that her husband was still conscious and attempting to talk to her as he lay bleeding to death on the garage floor. All of these facts tend to show that Rob Andrew suffered serious physical abuse, and was conscious of the fatal attack for several minutes. *See Ledbetter v. State*, 1997 OK CR 5, ¶ 53, 933 P.2d 880, 896 (evidence that murder victim was likely aware that she was about to be assaulted because defendant had

---

18. Evidence relating to both aggravating circumstances was presented in the guilt stage of trial, and that evidence was formally incorporated into the punishment stage. In fact, the punishment stage evidence was essentially limited to victim-impact and mitigation witnesses.

attempted to kill her one week earlier, that she tried to defend herself from the fatal attack, and that she attempted to communicate with a neighbor after the attack was sufficient to show that the murder was especially heinous, atrocious or cruel).

¶ 77 After finding that the murder was accompanied by torture or serious physical abuse, the jury may also consider the attitude of the killer and the pitiless nature of the crime. *Lott,* 2004 OK CR 27 at ¶ 172, 98 P.3d at 358; *Phillips v. State,* 1999 OK CR 38, ¶ 80, 989 P.2d 1017, 1039. That the victim was acquainted with his killers is a fact relevant to whether the murder was especially heinous, atrocious, or cruel. In finding the murder in *Boutwell v. State,* 1983 OK CR 17, ¶ 40, 659 P.2d 322, 329 to be especially heinous, atrocious, or cruel, this Court observed:

In this case the killing was merciless. The robbers planned well in advance to take the victim's life. Even more abhorrent and indicative of cold pitilessness is the fact that the appellant and the victim knew each other.

¶ 78 We find the situation in the present case even more pitiless. Rob Andrew correctly suspected his wife of having an affair with a man he trusted as his insurance agent. He correctly suspected his wife and her lover of trying to wrest control of his life insurance away from him. He correctly suspected his wife and her lover of attempting to kill him several weeks before by severing the brake lines on his car. He confided in others that he was in fear of his life. Having separated from his wife, Rob Andrew was murdered as he returned to the family home to pick up his children for the Thanksgiving holiday. From the evidence, a rational juror could have concluded, beyond a reasonable doubt, that Rob Andrew had time to reflect on this cruel state of affairs before he died. The evidence sup-

ported this aggravating circumstance, and this proposition is denied.

■■■ ¶ 79 In **Proposition 15,** Appellant contends the evidence is insufficient to support the jury's finding that the murder was motivated by "remuneration or the promise of remuneration," as defined by 21 O.S.2001, § 701.12(3).[19] Relying on *Boutwell,* 1983 OK CR 17 at ¶¶ 30–38, 659 P.2d at 328–29, and *Johnson v. State,* 1982 OK CR 37, ¶¶ 38–41, 665 P.2d 815, 824, Appellant claims that this aggravating circumstance should not apply to every situation where a murder was accompanied by some sort of financial gain, but rather, only where the murder was "primarily" motivated by the hope of financial gain.[20]

¶ 80 Both *Boutwell* and *Johnson* involved murder during the commission of an armed robbery. In each case, we held that the "murder for remuneration" aggravator should not be read so broadly as to apply to every situation where a person was killed during a pursuit for money or property, such as an armed robbery. However, we have held that the aggravator is squarely applicable where the killing was motivated by the hope of receiving life insurance proceeds. *See e.g. Stemple,* 2000 OK CR 4 at ¶¶ 2–10, 65, 994 P.2d at 65–66, 73 (evidence that defendant, who was having an extramarital affair, arranged to have his wife killed and hoped to collect life insurance proceeds held sufficient to establish this aggravating circumstance); *see also Plantz,* 1994 OK CR 33 at ¶¶ 41–42, 876 P.2d at 281 and *Bryson v. State,* 1994 OK CR 32, ¶ 50, 876 P.2d 240, 258–59 (evidence sufficient to support "murder for remuneration" aggravator, where wife (Plantz) and her boyfriend (Bryson) conspired and actually carried out plan to kill husband with the hope of obtaining insurance proceeds). The reason seems obvious to us and clearly within the letter and spirit of § 701.12(3).[21]

---

19. This statute defines the aggravating circumstance as follows: "The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration."

20. Appellant relies on this passage from *Johnson:* "Murder for remuneration has also been applied to killings motivated primarily to obtain proceeds

from an insurance policy, murder of a testator in order to secure a devise or legacy, and killings which occur in a kidnapping-extortion situation." *Johnson,* 1982 OK CR 37 at ¶ 40, 665 P.2d at 824.

21. Other jurisdictions have reached similar conclusions based on their own capital sentencing schemes. *Cf. People v. Michaels,* 28 Cal.4th 486, 122 Cal.Rptr.2d 285, 49 P.3d 1032, 1052 (2002)

¶ 81 Appellant reads a passage in *Johnson* as requiring that the State to prove that financial gain was the "primary" motive for the murder. We disagree. Section 701.12(3) does not require the State to prove a financial motive to the exclusion or diminution of other possible motives. When read in context, the word "primarily" as used in *Johnson* distinguishes cases where the murder was merely incidental to a robbery or similar attempt to obtain property, as was the case in *Johnson* and *Boutwell*. We find the situation in the companion cases of *Bryson* and *Plantz* more analogous, and language from *Plantz* readily applicable here:

> Evidence in the present case showed that the crime was motivated by financial gain. It was committed after the opportunity of weeks of reflection. It was not a crime of passion, nor was the murder committed as an afterthought while Appellant was in the course of committing another felony offense, such as robbery or burglary. The fact that Appellant was apprehended before she could actually collect the money does not obviate this aggravating circumstance.

*Plantz*, 1994 OK CR 33 at ¶ 42, 876 P.2d at 281 (emphasis added).

¶ 82 As in *Plantz*, the evidence in this case supports a finding that the murder of Rob Andrew was motivated by a desire to remove the third side of a love triangle, and reap financial gain from insurance proceeds in the process. The life insurance proceeds were no afterthought in this case. Appellant was not only having an affair with the victim's wife; he was the victim's life insurance agent as well. As such, he was particularly well-positioned to try to transfer ownership of Rob Andrew's life insurance policy to Brenda in the months before the murder.

¶ 83 Appellant claims that as a mere paramour, he had no standing to benefit directly from any proceeds Brenda might receive. We find no merit to this argument either. The evidence showed that Appellant hoped to enjoy a life with Brenda Andrew and her children without Rob Andrew's interference. Appellant clearly hoped to partake of the insurance proceeds, even if he was not a contractual beneficiary. *See Bryson*, 1994 OK CR 32 at ¶ 50, 876 P.2d at 259. A rational juror could easily have found that the murder was committed with the hope of remuneration. *DeRosa*, 2004 OK CR 19 at ¶ 85, 89 P.3d at 1153. This proposition is denied.

¶ 84 In Proposition 16, Appellant claims that if even one of the two aggravating circumstances is stricken for insufficient evidence, this Court cannot reassess the propriety of the death penalty based on the one remaining aggravator, but must instead modify Appellant's sentence on Count 1 to life in prison without parole. Because we have found the evidence sufficient to support both aggravating circumstances found by the jury, this proposition is moot. *Patton v. State*, 1999 OK CR 25, ¶ 15, 989 P.2d 983, 989; *LaFevers v. State*, 1995 OK CR 26, ¶ 47, 897 P.2d 292, 311.

## VII. Cumulative error and motion to supplement.

¶ 85 In Proposition 17, Appellant claims that the cumulative effect of the errors raised on appeal denied him a fair trial, or at least a fair capital sentencing proceeding. A cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Dodd*, 2004 OK CR 31 at ¶ 116, 100 P.3d at 1051. Even when there have been prejudicial irregularities during the course of a trial, relief is warranted only if the cumulative effect of all the errors denied Appellant a fair trial. *Id.*; *Bechtel v. State*, 1987 OK CR 126, ¶ 12, 738

("A killing for the purpose of obtaining life insurance benefits, as contrasted with a killing during a burglary or robbery, falls squarely within the scope of the financial gain special circumstance"); *Fitts v. State*, 982 S.W.2d 175, 188 (Tex.App.1998) (capital sentencing factor involving motive of "remuneration" or "promise of remuneration" is "not limited to murder-for-hire situations," but encompasses "a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act"); *see also State v. Chew*, 150 N.J. 30, 695 A.2d 1301, 1312 (1997) ("[A]lmost every jurisdiction that has considered a broadly-worded pecuniary gain [capital sentencing] factor has applied the factor to killings to collect insurance proceeds").

P.2d 559, 561. We have found no merit to the propositions of error raised by Appellant and, consequently, we find no error by accumulation.

¶ 86 In Proposition 18, Appellant asks to supplement his brief with any meritorious issues that may be raised in his pending capital post-conviction proceeding. As the State points out, any issues properly raised on post-conviction can be fully evaluated within the context of that action. Because Appellant cites no authority for such a request, and we are aware of none, this proposition is denied. *Torres v. State,* 1998 OK CR 40, ¶ 32, 962 P.2d 3, 14.

## VIII. Mandatory sentence review.

¶ 87 Pursuant to 21 O.S.2001, § 701.13(C), this Court is required to review Appellant's death sentence to determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's findings on aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. As to the latter, the jury found the existence of two aggravating circumstances: (1) that the murder was especially heinous, atrocious, or cruel, and (2) that the murder was committed for purposes of remuneration or the hope of remuneration. In our discussion of Propositions 14 and 15, we found that each aggravating circumstance was supported by evidence. We found no prejudice in the punishment-stage comments of the prosecutor (Propositions 9 and 10), victim impact evidence (Proposition 11), the comments of a mitigation witness (Proposition 12), or in defense counsel's own performance (Proposition 13). Upon our review of the record as a whole, we find that the sentence of death was not the product of passion, prejudice, or any other arbitrary factor. Finding no error warranting reversal or modification, the Judgment and Sentence is **AFFIRMED.**

## DECISION

¶ 88 The Judgment and Sentence of the district court is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App.

(2007), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, P.J., and A. JOHNSON and LEWIS, JJ.: concur.

CHAPEL, J.: Concurs In Part/Dissents In Part.

CHAPEL, Judge, Concurs In Part/Dissents In Part:

¶ 1 I concur in affirming the conviction for First Degree Murder (Count I) and I concur in affirming the death sentence for that crime. However, I would reverse and dismiss the Conspiracy (Count 2) conviction, as I believe it to violate the double jeopardy clauses of both the State and Federal Constitutions.